## ATLANTIC COAST LINE RAILROAD COMPANY *v.* NORTH CAROLINA CORPORATION COMMISSION.

### ERROR TO THE SUPREME COURT OF THE STATE OF NORTH CAROLINA.

No. 15.  Argued February 28 and March 1, 1907.—Decided April 29, 1907.

Railroad companies from the public nature of the business by them carried on, and the interest which the public have in their operation are subject as to their state business to state regulation, which may be exerted either directly by the legislative authority or by administrative bodies endowed with power to that end.

The public power to regulate railroads and the private right of ownership of such property coexist and do not the one destroy the other; and where the power to regulate is so arbitrarily exercised as to infringe the rights of ownership the exertion is void because repugnant to the due process and equal protection clauses of the Fourteenth Amendment.

An order of a state railroad commission requiring a railroad company to so arrange its schedule as to furnish transportation between two points so as to make connections with through trains, *held,* under the circumstances of this case, not to be so arbitrary or unreasonable as to transcend the limits of regulation and to be in effect either a denial of due process of law or a deprivation of the equal protection of the laws, or a taking of property without compensation.

Whether a regulation of a state railroad commission otherwise legal is arbitrary and unreasonable because beyond the scope of the powers delegated to the commission is not a Federal question.

It is within the power of a state railroad commission to compel a railroad company to make reasonable connections with other roads so as to pro-

VOL. CCVI—1                                              (1)

mote the convenience of the traveling public, and an order requiring the running of an additional train for that purpose, if otherwise just and reasonable, is not inherently unjust and unreasonable because the running of such train will impose some pecuniary loss on the company. While the enforcement by a State of a general scheme of maximum rates so unreasonably low as to be unjust and unreasonable may be confiscation and amount to taking property without due process of law, the State has power to compel a railroad company to perform a particular and specified duty necessary for the convenience of the public even though it may entail some pecuniary loss. *Smyth* v. *Ames*, 169 U. S. 526, distinguished.

The facts are stated in the opinion.

*Mr. John G. Johnson,* with whom *Mr. Warren G. Elliott* and *Mr. Frank P. Prichard* were on the brief, for plaintiff in error:

A State cannot require a railroad company to run a special daily train at a loss for the convenience of a limited number of passengers who wish to make close connection with a particular train on a crossing road, it appearing that it is already running sufficient trains to accommodate the general travel on its lines and has arranged its schedules to best accommodate general travel and connect with all connecting roads, and that its failure to connect with such particular train was due to a change of schedule on the crossing road to which it was impracticable to conform by any change in the schedule of the train which had made the connection under the original schedule.

As to the power of the State to regulate railroads and the constitutional limitations upon the exercise of such power and as to what are unreasonable regulations, see *Wisconsin, &c. R. R. Co.* v. *Jacobson,* 179 U. S. 287; *Smyth* v. *Ames,* 169 U. S. 466–526; *St. Louis & S. F. Ry.* v. *Gill,* 156 U. S. 649; *Chicago, M. & St. P. Ry.* v. *Tompkins,* 176 U. S. 167.

A statute which in effect applied to one corporation only and not to others in like business was unreasonable. Every partial or private law which directly proposes to destroy or affect individual rights or does the same thing by affording remedies leading to similar consequences, is unconstitutional and void.

*Cotting* v. *Kansas City Stock Yards Co.,* 183 U. S. 79; *Lake Shore & Mich. Southern* v. *Smith,* 173 U. S. 684.

In the case at bar the order complained of was not an exercise of the police power of the State. It was not made to protect the health, the morals, or the safety, of the citizens. It was the exercise of a governmental power to regulate, for public convenience, the facilities afforded to the public by a corporation. See *Minneapolis & St. L. R. R.* v. *Minnesota,* 186 U. S. 257. An order which is reasonable, when necessary for the protection of the lives or health of the public, may be very unreasonable if made simply for public convenience.

The order in the present case was a very unusual one.

None of the authorities cited by the court, or counsel in the court below, show any attempt by a state legislature, or a commission, to increase the number of trains on a railroad. *People* v. *St. L., A. & T. H. R. R. Co.,* 176 Illinois, 512, distinguished, and see *Ohio & Miss. Ry.* v. *People,* 120 Illinois, 200.

No case has held that, in the absence of statutory requirements, a railway company may be compelled by mandamus to increase the number of trains on its road or to run daily a particular number of trains, over its road, and there is no common law authority for making such an order.

As to general regulations prescribing a minimum number of daily trains, see *Lake Shore & Mich. South.* v. *Ohio,* 173 U. S. 285.

The cases show no attempted exercise by any State, or commission, of a power to order a particular railroad to put on an additional train between certain points for the sake of affording additional convenience of transportation. Such a power would partake more of the nature of an operation of such particular road than of a general regulation of all roads for the public convenience.

In this case the order compelled the railroad to run an additional train at a pecuniary loss.

This is the appropriation of property without compensation.

There can be no just distinction between taking possession of and using a company's property at its expense and forcing the company to use the property for the benefit of the public at a loss to itself. *Chicago, Mil. &c. Ry.* v. *Tompkins,* 176 U. S. 167–173.

Conceding that it is within the power of the legislature to compel this particular railroad to run this particular additional train over its road, to meet some special public need, it is certainly not within the power of the legislature to compel the railroad to do it for nothing, much less to do it at a loss.

Even if the legislature had the power to direct the running of a special additional train at a loss in order that a comparatively few passengers from a branch line might make convenient connection with a particular train over another road, the order itself was under the circumstances so unreasonable that it must be considered an unwarrantable interference with the property rights of the Atlantic Coast Line Railroad, which was running a sufficient number of trains for all necessary purposes.

There could not have been a more unreasonable and unjustifiable interference with its affairs. It is no answer to this to say that the jury found it was "reasonable, and proper that for the convenience of the traveling public" the connection should be made. The other facts found by the jury, coupled with the omission of either finding or testimony justifying the order, make the question one for the court. The finding resulted from a failure properly to instruct the jury as to the duty and rights of the appellant. It is for the court to say what is the nature of the convenience which justifies such an order and how far, for such convenience, the legislature or commission can interfere with the reasonable exercise by the railroad of its right to operate its own road.

*Mr. Robert D. Gilmer,* Attorney General of the State of North Carolina, and *Mr. F. A. Woodard,* for defendant in error:

The North Carolina Corporation Commission found as a fact that its order could be carried into effect by the extension of

either the Spring Hope òr the Plymouth run, and this finding was affirmed by the Supreme Court of North Carolina.

The highest court of the State having therefore decided against the plaintiff in error upon an independent ground, not involving a Federal question, and broad enough to maintain the judgment, the judgment of the Supreme Court of North Carolina should be affirmed or the writ of error dismissed without considering the Federal question, assuming that one is presented in the record. *Kennebec & P. R. Co.* v. *Portland & R. R. Co.*, 14 Wall. 23; *Hammond* v. *Johnson*, 142 U. S. 73; *Northern P. R. Co.* v. *Ellis*, 144 U. S. 458; *Delaware City &c.* v. *Reybold*, 142 U. S. 636; *Walter A. Wood Co.* v. *Skinner*, 139 U. S. 293; *Henderson Bridge Co.* v. *Henderson*, 141 U. S. 679; *Missouri P. R. Co.* v. *Fitzgerald*, 160 U. S. 556; *California Powder Works* v. *Davis*, 151 U. S. 389, 393; *Murdock* v. *Memphis*, 20 Wall. 590; *McLaughlin* v. *Fowler*, 154 U. S. 663.

The presumption of law is always in favor of the maintenance of the order of a railroad commission, and the same will not be set aside unless flagrantly in violation of the rights of the railroad company. *Dow* v. *Beidleman*, 125 U. S. 680; *Reagan* v. *Trust Co.*, 154 U. S. 362, 395; *Railroad Co.* v. *Tompkins*, 176 U. S. 167, 173; Brannon on the Fourteenth Amendment, 197.

The public safety, interest and convenience are clearly embraced within the legislative power of the State, and the exercise of this power does not deprive the plaintiff in error of its property without due process of law under the constitution of North Carolina or of the United States. *Brass* v. *North Dakota*, 153 U. S. 391; *Budd* v. *New York*, 143 U. S. 517; *Munn* v. *Illinois*, 94 U. S. 113; *Jacobson* v. *Railroad Co.*, 71 Minnesota, 519; *Smyth* v. *Ames*, 169 U. S. 466; *Lake Shore &c. Railway Co.* v. *Smith*, 173 U. S. 684; *Gladson* v. *Minnesota*, 166 U. S. 427; *Railroad Co.* v. *Gibbes*, 142 U. S. 386; *Wisconsin &c. Railroad Co.* v. *Jacobson*, 179 U. S. 287; *Minn. & St. Louis R. R. Co.* v. *Minnesota*, 193 U. S. 53; *Railroad* v. *Railroad Commission*, 109 Louisiana, 247.

The doctrine that if a railroad as an entirety does a business which is compensatory it has no legal right to complain that an order of a railroad commission may deprive it of revenue over a portion of its line, has been affirmed by the highest courts of several States. Among these cases the following are noted: *Railway Co.* v. *Smith,* 60 Arkansas, 221; *Matter of Auburn & W. R. R. Co.,* 37 App. Div. 162; *S. C.* 55 N. Y. Supp. 895; *Morgan's L. & T. R. & S. S. Co.* v. *Railroad Commission,* 109 Louisiana, 247; *Pensacola &c. R. R. Co.* v. *State of Florida,* 25 Florida, 310; *People* v. *St. L., A. & T. H. R. R. Co.,* 176 Illinois, 512; *Union Traction Co.* v. *Chicago,* 199 Illinois, 579.

MR. JUSTICE WHITE delivered the opinion of the court.

Did the order of the North Carolina Corporation Commission, the enforcement of which was directed by the court below, invade constitutional rights of the Atlantic Coast Line Railroad Company, hereafter spoken of as the Coast Line, is the question which arises on this record for decision. A sketch showing the situation of the railway tracks at and relating to the place with which the controversy is concerned was annexed by the court below to its opinion, and that sketch is reproduced to aid in clearness of statement.

For years prior to October, 1903, the Coast Line operated daily an interstate train from Richmond, Virginia, through North Carolina to Florida. This train, known as No. 39, moved over the main track from Richmond to Wilson, North Carolina, thence by the track designated as the cut-off via Selma and Fayetteville to Florida. The train (No. 39) was scheduled to reach Selma at 2:50 in the afternoon and to leave at 2:55. The Southern Railway owned or controlled a road in North Carolina which crossed the Coast Line main track at Goldsboro and the cut-off track at Selma. On this road there was operated daily a train from Goldsboro via Raleigh to Greensboro, North Carolina, at which point connection was made with the main track of the Southern road. This Southern

train, known as No. 135, left Goldsboro at 2:05 in the afternoon
and Selma at 3 o'clock.    Thus at Selma it connected with No.
39 of the Coast Line.    The Coast Line also operated in North
Carolina the branch lines shown on the sketch, which radiated
easterly, and served a considerable area of territory.    These
branches connected with the main track at Rocky Mount, a
station forty-two miles nearer Richmond than Selma.    At
Rocky Mount there also was a connection with a Coast Line
road running from Pinners Point, near Norfolk, Virginia.
Over this road also the Coast Line operated a train, which left
Pinners Point in the morning and connected with the Coast
Line train No 39 at Rocky Mount.    The departure of the train
in question from Pinners Point was so arranged as to enable
boats timed to arrive at Norfolk during the night or early
morning to make, by ferry to Pinners Point, a morning connec-
tion with the train.    On the third of October, 1903, the Southern
Railway notified the North Carolina Corporation Commission
of a contemplated change of schedule on its line from Goldsboro
via Raleigh to Greensboro.    By the change, which was to go
into effect on the 11th of October, Southern train No. 135,
instead of leaving Goldsboro at 2:05, would leave at 1:35 in
the afternoon, and would leave Selma at 2:25 instead of 3.
As a result, the connection at Selma between the Coast Line
train No 39 and the Southern train would be broken.    The
North Carolina Corporation Commission, by letter, on the sixth
of October, called the attention of the general manager of the
Coast Line to the contemplated change of time by the Southern,
and requested that line to advance the time of No. 39 to enable
that train to reach Selma at 2:25, thus continuing the connec-
tion with the Southern.    On the twelfth of October the super-
intendent of transportation of the Coast Line answered.    He
stated that the schedule of train No. 39 from Richmond to
Selma was already so fast that it was very difficult to make
the connection at Selma, and that it would be impossible to
advance the time of arrival at Selma as requested.    It was
besides represented that to do so would require a breaking of

the connection made with the Norfolk train at Rocky Mount and would disarrange the running time of the train south of Selma and disturb connections which that train made with other roads south of that point.   However, it was pointed out that as train No. 39 did not originate at Richmond, but was a through train made up at New York, carried from thence to Washington by the Pennsylvania and from Washington to Richmond by the Richmond, Fredericksburg and Potomac, that negotiations would be put on foot with those roads with an endeavor to secure an acceleration of the time of the departure of the train from New York and Washington, so as thereby to enable an earlier departure from Richmond.   On the eleventh of October the change of time became operative and the connection at Selma was broken.

A complaint having been lodged with the corporation commission because of the inconvenience to the public thereby occasioned, both the Southern and Coast Line were notified that a hearing would be had concerning the subject on the 29th.   On that day the railways, through their officials, appeared.   The Southern represented that its change in time was because it was absolutely dangerous to operate its train at the speed required by the previous schedule, and indeed that the lengthened schedule was yet faster than desired. The Coast Line reiterated the impossibility of changing the schedule of train No. 39 from Richmond to Selma unless there was a change between New York and Richmond.   It stated that there was to be a meeting in Washington on November 6 of the representatives of various roads in the South, and that it hoped, as the result of that meeting, to so arrange that No. 39 would be scheduled for delivery at Richmond at an earlier hour, thus enabling its time to Selma to be advanced.   The commission continued the subject for further consideration. On November 9 the superintendent of the Coast Line advised the corporation commission that at the meeting in Washington it had been impossible to obtain an earlier departure of the train from New York and Washington, but that the Pennsyl-

vania still had the matter under consideration. Finally, in answer to urgent requests from the commission, by a letter of November 13 and telegram of November 14 the Coast Line informed the corporation commission that it regretted it could make no change in its schedule of train No. 39 because the Pennsylvania Railroad had definitively expressed its inability to make any change in the hour of departure of the train from New York, as "to do so would be incompatible with the duties which the Pennsylvania Railroad owed to the public, to other roads and to its contracts concerning the transportation of the mail and express matter. Thereupon the corporation commission entered the following order:

"Whereas, the convenience of the traveling public requires that close connection be made between the passenger trains on the Atlantic Coast Line Railroad and the Southern Railway at Selma daily in the afternoon of each day;

"And whereas, it appears that such close connection is practicable:

"It is ordered that the Atlantic Coast Line Railroad arrange its schedule so that the train will arrive at Selma at 2:25 P. M. each day instead of 2:50 P. M., as the schedule now stands.

"It is further ordered that if the Atlantic Coast Line trains have passengers en route for the Southern Railway, and are delayed, notice shall be given to the Southern Railway, and that the Southern Railway shall wait fifteen minutes for such delayed trains upon receipt of such notice.

"This order shall take effect December 20, 1903."

The Southern, on receipt of the order, expressed its intention to comply. The Coast Line addressed to the commission a letter protesting against the order and requesting its withdrawal and asking for a further hearing. The letter making this request reviewed the previous correspondence. It pointed out that the connection at Selma had been a very old one and that its breaking was solely caused by the act of the Southern in changing the time of its train. It declared that the Coast Line at once, on hearing of the intention of the Southern to make

the change, urgently requested that road not to do so. On this subject the letter said:

"On October 6th, I further advised the Southern Railway that if their train was scheduled to leave Selma at two twenty-five P. M. this would break the connection with our No. 39, and stated to them that the connection was a most important one, being the principal outlet for passengers en route from eastern Carolina to Raleigh and other points on their line, and that we hoped that they could see their way clear not to disturb the connection, as it was impossible for us to get No. 39 to Selma at an earlier hour than the present schedule, owing to the inability of northern connections to deliver the train to us at Richmond any sooner."

Proceeding to point out the failure of the negotiations with the Pennsylvania and recapitulating the previous statements concerning the rapidity of the schedule of No. 39 between Richmond and Selma, the exacting nature of its work and connections, the absolute impossibility of making it faster was insisted upon. Indeed, there was annexed to the letter a report of the time of No. 39 at Selma for a period of nearly five months, showing that the train had rarely made its connection at Selma.

The commission, after a hearing afforded officials of the Coast Line, suspended its prior order and fixed a day for a rehearing of the whole subject, both roads being notified to that effect. Upon the new hearing the matter was taken under advisement. On January 16 the commission stated the facts and its conclusions deduced therefrom. As to the operation of the two trains, their connection at Selma, the importance of this connection to the public and the breaking of the connection by the change of schedule, the facts found were identical with those above previously recited. In addition it was found that the Coast Line train No. 39 from Richmond to Selma was not only a through train, but also operated as a local train between Richmond and Selma, making all local stops and daily handling in consequence one or two extra express cars. It was found in accordance with the official time sheets of the running of the

train that it had arrived at Selma on schedule time only twice between August 1, 1903, and January 11, 1904. Considering the branch lines as marked on the sketch and the trains operated thereon and connecting with the main track at Rocky Mount it was found:

a. That a train was operated from Plymouth to Rocky Mount which left in the morning at 7:30 and arrived at Rocky Mount at 10:35, where it remained until 3:55 in the afternoon, when it returned to Plymouth.

b. That the road also operated a train from Spring Hope on the westerly side of the main track to Rocky Mount, leaving Spring Hope at 11:20 in the morning, arriving at Rocky Mount at 12:10 in the afternoon and leaving there at 4, arriving at Spring Hope at 4:45. The commission concluded as follows:

"Assuming that the statements made by the Atlantic Coast Line Railroad Company are true—that it was for the past five months impossible for them to bring No. 39 to Selma by schedule time, to wit, 2:50 P. M., more than twice, and that this train was more than ten minutes late every day except twenty-four —we must conclude that it is impracticable to require them to make a faster schedule and place this train at Selma at 2:25 P. M. instead of 2:50 P. M.; and therefore this much of the former order is revoked and annulled; but the commission is of the opinion that it is practicable and that the convenience of the traveling public requires that the Atlantic Coast Line Railroad Company furnish transportation for passengers from Rocky Mount to Selma after 12:50 P. M. and by or before 2:25 P. M. each day; that this can be done by extending the run of the Plymouth train to Selma instead of having it lie over at Rocky Mount as now, or by extending the run of the Spring Hope train to Selma instead of having it lie over at Rocky Mount as now. The distance from Plymouth to Rocky Mount is sixty-nine miles, and from Spring Hope to Rocky Mount is nineteen miles, and from Rocky Mount to Selma forty-two miles; or by providing a separate train for the service.

"And it is therefore ordered that the Atlantic Coast Line

Railroad Company furnish transportation for passengers from Rocky Mount to Selma after 12:50 P. M. and by or before 2:25 P. M. each day.

"It is further ordered that the Southern Railway hold its train No. 135 at Selma fifteen minutes if for any reason the Atlantic Coast Line train connecting at that point is delayed.

"It is further ordered that this order take effect on and after the 26th day of January, 1904."

Before the date fixed for the taking effect of this order the Coast Line filed five grounds of exception to its validity and prayed another hearing. The first asserted the impossibility of making the connection from Rocky Mount to Selma between the hours fixed by the commission by an extension of the run of either of the branch trains referred to in the order which the commission had rendered. The reasons principally relied upon to sustain the first exception were the inadequate character of the motive power of the branch road trains for operation on the main track, the speed at which the train would be obliged to travel and the congested condition of the business on the main track during the hours when the train from either of the branch roads would be obliged to use the main track for the purpose of making the connection. The second exception denied the possibility of making the connection by a special train from Rocky Mount to Selma within the time indicated, and besides asserted that such a train could not be operated without an actual loss. The power of the commission to compel the performance of "services without compensation to the company" was denied, and it was alleged that a taking of property without due process of law in violation of the state constitution and the Fourteenth Amendment to the Constitution of the United States would result from enforcing the order. The third exception denied the power of the commission under the state law to order the company to put on an extra train between Rocky Mount and Selma, and the fourth in effect reiterated the same ground. The fifth exception challenged the validity of the order as unreasonable, unjust and arbitrary and

beyond the power of the commission to render, because ample and sufficient accommodations for passengers desiring to connect at Selma with the Southern road were afforded by the Coast Line entirely irrespective of the connection which had formerly existed between train No. 39 of the Coast Line and train No. 135 of the Southern. The trains thus relied upon as showing a wholly adequate service for the purposes stated were eight in number, and, as enumerated in the exception, are stated in the margin.[1]

After a new hearing at which further testimony was taken, the corporation commission in substance adhered to its former view and reiterated its previous ruling. In its findings of fact it pointed out the importance of the connection at Selma, the admissions to that effect made by the railroad and the fact that

---

[1] 1. The train from Rocky Mount, southbound, in the early morning, makes a close connection at Goldsboro at 6:50 o'clock with the Southern for Raleigh and all points West.

2. The trains from Norfolk and Richmond make close connection at Goldsboro and Selma with the night train on the Southern for Raleigh and all points West.

3. The train from Weldon to Kinston makes close connection at Kinston with the Atlantic and North Carolina train for Goldsboro, which train in turn makes close connection with the Southern at Goldsboro at 9:40 P. M. for Raleigh and all points West.

4. The train No. 39, from Washington to Jacksonville, is due at Selma at 2:50 P. M., and the accommodation train No. 183, on the Southern, from Selma to Releigh and all points West, is scheduled to leave Selma at 3:25 P. M.

5. Train No. —, from Jacksonville to Washington, is due to arrive at Selma at 2:10 o'clock, and makes close connection there with the Southern, which leaves Selma at 2:25 P. M. for Raleigh and all points West.

6. Two trains leave Wilmington for the North, the first at 9:30 A. M., No. 48, and the other, No. 42, at 6:50 P. M. Both of these trains make close connections at Goldsboro with the Southern trains for Raleigh and all points West.

7. No. 34, leaving Smithfield at 7:00 A. M., makes close connection at Selma with the Southern going West for Raleigh and all points beyond, and the same train makes close connection at Weldon with the Seaboard train for Raleigh, and for Seaboard points South and West.

8. No. 102 leaves Goldsboro for Norfolk at 7:30 A. M., and makes close connection at Hobgood with No. 58, the train from Kinston to Weldon, and there with the Seaboard for Raleigh and points West.

that connection afforded the principal means of travel between the eastern and western parts of the State. The grounds relied upon in the exception to show that an extension of the run of either of the local trains from Rocky Mount to Selma as previously ordered was impracticable, were reviewed and found to be without foundation. The trains which it was alleged afforded adequate means for connection between the western and eastern part of the State, irrespective of the connection formerly existing at Selma by train No. 39, were analyzed, and as a matter of fact the service afforded by these trains was held to be wholly inadequate. Thus, for example, whilst it was found that the first train relied upon—the one from Rocky Mount to Goldsboro, arriving there at 6:50 in the morning—made a connection with a Southern Railway train moving from Selma via Raleigh to Greensboro, it was pointed out that it was inadequate because the train had no connection at its point of departure, Rocky Mount, with any incoming train over the large area covered by the branch roads, which area, it was stated, embraced a population of four hundred thousand people. Hence it was found that to use that train any person in the territory covered by the branch roads would be obliged to leave home the day before and pass the night at Rocky Mount. The fourth train relied upon, that is, a connection made by Coast Line No. 39 at Selma under the new schedule with a later train over the Southern road for Raleigh, was found to be but a connection with a Southern freight train, having no passenger car, but only a caboose. The trains under the second, third and sixth headings, connecting at Goldsboro or Selma in the afternoon and night, were found to make a connection only with a slow train over the Southern road, doing a mixed passenger and freight business, and which made no adequate connection beyond Raleigh to the west. The objection to suggested route No. 8, that is, via Weldon, and thence by the Seaboard Air Line to Raleigh and points further west, was decided to be that it was a longer route, more costly, and uncertain as to connections. The remaining suggested

routes were in effect disposed of upon similar considerations to those above adverted to.

Considering the operation of an extra train from Rocky Mount to·Selma or the extension of the run of one of the branch trains as directed in the previous order, and the objection that a loss would be·entailed in the operating expenses for such train or trains, the commission treated that fact as immaterial, because it·found as a matter of fact that the total receipts of the Coast Line in North Carolina, taken from business in that State, were sufficiently remunerative, and therefore that even · if the train was operated at a loss, as that loss would not reduce the total earnings below what was an adequate remuneration for the whole business, the order would not take the property of the road without due process of law.   Summing up its conclusions, the commission said:

"The commission is of the opinion that the facilities given heretofore by the Atlantic Coast Line Company to the traveling public should not be lessened; that the connection furnished passengers from the Washington branch, the Norfolk and Carolina branch, the Plymouth branch and the Nashville branch with No. 135, Southern Railway passenger train at Selma, and also for all points between Rocky Mount and Selma, for nearly ten years, should be restored; that if this cannot be done by the Atlantic Coast Line train No. 39, as formerly, on account of this train being heavier, containing usually one or more extra express cars, and in all usually ten or more cars, and on account of increase in business between Richmond and. Selma, which necessitates longer stops, then other facilities should be furnished by the Atlantic Coast Line Company; that this connection, which was the principal outlet for passengers from eastern Carolina to Selma and other Southern Railway points for the last ten years, instead of being abandoned should be made permanent and certain, and that this result be accomplished by carrying out the order heretofore made in this court. It is ordered, therefore, that the exceptions be, and they are hereby, overruled."

The Coast Line, as authorized by statute, appealed to the Superior Court of Wake County, city of Raleigh, and the case was there tried *de novo* before a court and jury. The jury, under the instructions of the court, considered and responded to the eight questions, which follow:

"1. Is it practicable for train No. 39 of the Atlantic Coast Line Railroad, due to arrive at Selma at 2:50 P. M., to make connection at Selma with train No. 135, westbound, of the Southern Railway, due to leave Selma at 2:25 P. M.?

"Answer. No.

"2. Is it practicable to make said connection by extending the run of the Plymouth train daily from Plymouth to Selma and return, and if so, what would be the additional expense?

"Answer. No.

"3. Is it practicable to make said connection by the use of the Spring Hope train, and if so, what would be the additional expense?

"Answer. No.

"4. In order to make such connection would defendant company have to run an additional train on its main line from Rocky Mount to Selma?

"Answer. Yes.

"5. Is it practicable for said train to safely run the schedule prescribed in plaintiff's order, having due regard to the number of trains and number of stops, on defendant's main line from Rocky Mount to Selma?

"Answer. Yes.

"6. What would be the daily cost of operating such train from Rocky Mount to Selma and return?

"Answer. $40.00.

"7. What would be the probable daily receipts from such train?

"Answer. $25.00.

"8. Is it reasonable and proper that, for convenience of the traveling public, the defendant company should be required to make such connection?

"Answer. Yes."

The answers to the first four questions were the result of peremptory instructions by the court, and the responses to the last four were deduced by the jury from the testimony submitted to its consideration.

The court granted the prayer of the Atlantic Coast Line to that effect and rendered judgment on the verdict in its favor. The corporation commission was held to be without power "to interfere with the right of railway companies to regulate for themselves the time and manner in which passengers and property should be transported," provided only such companies complied with the existing statutory direction "to run one passenger train at least each way over its line every week day." On appeal the Supreme Court of North Carolina reversed the judgment. The facts found by the corporation commission were reiterated, and it was held that error had been committed by the court below in instructing the jury to give a negative response to the first three propositions. Indeed it was declared that the only essential proposition submitted to the jury was the eighth, which required it to be determined whether the connection at Selma was necessary for the public convenience. Treating the facts found by the commission as sustaining the conclusion reached by that body, it was decided that the commission had power to make the order, and that the exercise of the authority was not repugnant either to the Constitution of the United States or of the State. Notwithstanding the finding of facts made concerning the means by which the connection at Selma was to be performed, the court construed the order of the commission as not having been solely based upon the means of performance referred to in the findings and as embracing not only a choice of the methods referred to therein, but any other which the Coast Line might choose to adopt, provided only it accomplished the purpose of the order. But whilst thus from one point of view, treating the order of the commission so as to render it unnecessary to pass upon the particular methods for mak-

ing the connection at Selma referred to in the findings, the court yet reviewed the means of performance therein stated. In doing so it was decided that although to execute the order of the commission it might be imperative for the Coast Line to operate at a pecuniary loss a new train from Rocky Mount to Selma, or the extension with like result of the movement of one or the other of the branch trains from Rocky Mount to Selma, no violation of any right of the Coast Line protected by the Constitution of the United States or of the State would arise. This was based upon the finding by the court that the average net earning of the railroad from its business in North Carolina was of such a character that an adequate remuneration would remain after allowing for any possible loss which might arise from operating either of the trains in question. 137 N. Car. 14.

All the assignments of error challenge the correctness of the decision below on the ground of its repugnancy to the due process or equal protection clauses of the Fourteenth Amendment. The elementary proposition that railroads from the public nature of the business by them carried on and the interest which the public have in their operation are subject, as to their state business, to state regulation, which may be exerted either directly by the legislative authority or by administrative bodies endowed with power to that end, is not and could not be successfully questioned in view of the long line of authorities sustaining that doctrine.[1] Accepting this

---

[1] *Chicago, B. & Q. R. Co.* v. *Iowa*, 94 U. S. 155; *Peik* v. *Chicago & N. W. R. Co.*, 94 U. S. 164; *Chicago, M. & St. P. R. Co.* v. *Ackley*, 94 U. S. 179; *Winona & St. Peter R. Co.* v. *Blake*, 94 U. S. 180; *Stone* v. *Wisconsin*, 94 U. S. 181; *Ruggles* v. *Illinois*, 108 U. S. 536; *Illinois Central R. Co.* v. *Illinois*, 108 U. S. 541; *Stone* v. *Farmers Loan & Trust Co.*, 116 U. S. 307; *Stone* v. *Illinois Central R. Co.*, 116 U. S. 347; *Stone* v. *New Orleans & Northeastern R. Co.*, 116 U. S. 352; *Dow* v. *Beidelman*, 125 U. S. 680; *Charlotte, C. & A. R. Co.* v. *Gibbes*, 142 U. S. 386; *Chicago & Grand Trunk R. Co.* v. *Wellman*, 143 U. S. 339; *Pearsall* v. *Great Northern R. Co.*, 161 U. S. 646, 665; *Louisville & N. R. Co.* v. *Kentucky*, 161 U. S. 677, 695; *Wisconsin, M. & P. R. Co.* v. *Jacobson*, 179 U. S. 287; *Minneapolis & St. L. R. Co.* v. *Minnesota*, 186 U. S. 257; *Minnesota & St. L. R. Co.* v. *Minnesota*, 193 U. S. 53;

general rule, the assignments of error rest upon the hypothesis that the order which the court below enforced was so arbitrary and unreasonable in its character as to transcend the limits of regulation and to be in effect a denial of due process of law or a deprivation of the equal protection of the laws.

As the public power to regulate railways and the private right of ownership of such property coexist and do not the one destroy the other, it has been settled that the right of ownership of railway property like other property rights finds protection in constitutional guarantees, and, therefore, wherever the power of regulation is exerted in such an arbitrary and unreasonable way as to cause it to be in effect not a regulation but an infringement upon the right of ownership, such an exertion of power is void because repugnant to the due process and equal protection clauses of the Fourteenth Amendment.[1] The result, therefore, is that the proposition relied upon is well founded if it be that the order which the court below enforced was of the arbitrary and unreasonable character asserted.

In coming to consider the question just stated it must be borne in mind that a court may not, under the guise of protecting private property, extend its authority to a subject of regulation not within its competency, but is confined to ascertaining whether the particular assertion of the legislative power to regulate has been exercised to so unwarranted a degree as in substance and effect to exceed regulation, and be equivalent to a taking of property without due process of law, or a denial of the equal protection of the laws. We shall not in analyzing the case undertake to review in their order the

*Chicago, B. & Q. R. Co.* v. *Illinois,* 200 U. S. 561, 584; *Atlantic Coast Line* v. *Florida,* 203 U. S. 256; *Seaboard Air Line* v. *Florida,* 203 U. S. 261.

[1] *Stone* v. *Farmers' Loan & Trust Co.,* 116 U. S. 307, 331; *Chicago, M. & St. P. R. Co.* v. *Minnesota,* 134 U. S. 418, 455; *Chicago & Grand Trunk R. Co.* v. *Wellman,* 143 U. S. 339, 344; *Reagan* v. *Farmers' Loan & Trust Co.* (*No.* 1), 154 U. S. 362, 399; *St. Louis & San Francisco R. Co.* v. *Gill,* 156 U. S. 649, 657; *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 241; *Smyth* v. *Ames,* 169 U. S. 466, 512; *Chicago, M. & St. P. R. Co.* v. *Tompkins,* 176 U. S. 167, 172; *Minneapolis & St. Louis R. Co.* v. *Minnesota,* 186 U. S. 257; *Chicago, B. & Q. R. Co.* v. *Illinois,* 200 U. S. 561, 592.

ten propositions of error found in the record and reproduced in the briefs of counsel, as each proposition, although numbered separately, but reiterate grounds of error to be found in the others. In other words, the various grounds of error are so interblended in the several propositions as to render it impossible to treat one as distinct from the other. All the grounds, however, which the propositions assert as establishing the arbitrary and unreasonable character of the order complained of may be embraced under four general headings, which we proceed to dispose of.

1. *That the order was arbitrary and unreasonable, because beyond the scope of the authority delegated to the corporation commission by the state law.*

As this proposition involves no Federal question and is concluded by the judgment entered below, we put the subject out of view. And, although not cognate to this proposition, to clear the way for the consideration of the substantial issues we also put aside the suggestion made in argument that as the Southern Railway by its change of schedule originally rendered the connection at Selma impossible, therefore that road should have been compelled to restore the connection by a modification of the schedule or schedules of the trains by it operated. We put this suggestion aside because it does not seem to have been seriously urged in the court below, and besides is so directly refuted by the findings that we think it requires no further notice.

2. *The order was arbitrary and unreasonable, because when properly considered it imposed upon the Coast Line a duty foreign to its obligation to furnish adequate facilities for those traveling upon its road.*

This rests upon the assumption that as the order was based not upon the neglect of the Coast Line to afford facilities for travel over its own road, but because of the failure to furnish facilities to those traveling on the Coast Line who desired also to connect with and travel on the Southern road, therefore the order was in no just sense a regulation of the business

of the Coast Line. This reduces itself to the contention that, although the governmental power to regulate exists in the interest of the public, yet it does not extend to securing to the public reasonable facilities for making connection between different carriers. But the proposition destroys itself, since at one and the same time it admits the plenary power to regulate and yet virtually denies the efficiency of that authority. That power, as we have seen, takes its origin from the *quasi*-public nature of the business in which the carrier is engaged, and embraces that business in its entirety, which of course includes the duty to require carriers to make reasonable connections with other roads, so as to promote the convenience of the traveling public. In considering the facts found below as to the connection in question, that is, the population contained in the large territory whose convenience was subserved by the connection, and the admission of the railroad as to the importance of the connection, we conclude that the order in question, considered from the point of view of the requirements of the public interest, was one coming clearly within the scope of the power to enforce just and reasonable regulations.

3. *That the facilities afforded the public by the railroad were of such a character as to demonstrate that the extra burden which would result from the compliance with the order was wholly arbitrary and unreasonable.*

This rests upon the assumption that as there were several existing daily connections between trains of the Coast Line and those of the Southern at Selma, which might be availed of by those desiring to travel from eastern to western North Carolina and beyond, and, as besides, the proof established that another connection operating the same result was afforded by way of Weldon and the Seaboard Air Line to Raleigh and thence further west, therefore it was both arbitrary and unreasonable to superadd an unnecessary connection. Conceding, as must be done, that the nature and extent of the existing facilities furnished by a carrier for the public convenience are

essential to be considered in determining whether an order directing an increase of such facilities is just and reasonable, and that the deficiency of facilities must clearly appear to justify an order directing the furnishing of new and additional facilities, we think the proposition here relied on to be without merit. Its error arises from assuming that adequate facilities were afforded at Selma or via Weldon and the Seaboard without reference to the order complained of. In view of the facts as to the connections at Selma and the Weldon route found by the commission and reiterated by the court, which we have previously stated and which we accept, we cannot escape drawing for ourselves the conclusion deduced both by the commission and the court below that the connections relied on were wholly inadequate for the public convenience, and, therefore, a state of things existed justifying the order.

4. *That, however otherwise just and reasonable the order may have been, it is inherently unjust and unreasonable because of the nature of the burden which it necessarily imposes.*

This proposition is based on the hypothesis that the order, by necessary intendment, directed the Coast Line to operate an additional train, although such train could not be operated without a daily pecuniary loss. The premise upon which this proposition rests would seem to be irrelevant, since the court below in one aspect of its opinion treated the order of the commission as not requiring the operation of an extra train from Rocky Mount to Selma. Yet, as the facts found by the commission and which were affirmed by the court would indicate that it was considered that the operation of such train was the most direct and efficient means for making the ordered connection, and as the court considered and passed upon the duty of the railroad to comply with the order, even if to do so it became necessary to operate the extra train at a loss, we think the proposition relied upon is open and must be decided. The contention is that the fact that some loss would result from the requirement that the extra train be operated, in and of itself, conclusively establishes the unrea-

sonableness of the order and demonstrates that to give it effect would constitute a taking of property without due process of law in violation of the Fourteenth Amendment. Conclusive support for this contention, it is insisted, is afforded by the doctrine upheld in *Smyth* v. *Ames*, 169 U. S. 466, and the cases which preceded that decision. The cases relied upon, however, only involved whether a general scheme of maximum rates imposed by state authority prevented the railroads from earning a reasonable compensation, taking into view all proper considerations as to the value of the property and the cost of operation, and, if not, whether the enforcement of rates so unreasonably low would be unjust and unreasonable, and, therefore, be confiscation, that is, a taking of property without due process of law in violation of the Constitution of the United States. The principle upon which the cases in question proceeded was thus summed up by Mr. Justice Harlan, delivering the opinion of the court in *Smyth* v. *Ames*, 169 U. S. 526:

" A state enactment or regulations made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation, as under all the circumstances is just to it and to the public, would deprive such carrier of its property without due process of law and deny to it the equal protection of the laws, and would, therefore, be repugnant to the Fourteenth Amendment of the Constitution of the United States."

But this case does not involve the enforcement by a State of a general scheme of maximum rates, but only whether an exercise of state authority to compel a carrier to perform a particular and specified duty is so inherently unjust and unreasonable as to amount to the deprivation of property without due process of law or a denial of the equal protection of the laws. In a case involving the validity of an order enforcing a scheme of maximum rates of course the finding that the enforcement of such scheme will not produce an adequate return for the operation of the railroad, in and of itself dem-

onstrates the unreasonableness of the order. Such, however, is not the case when the question is as to the validity of an order to do a particular act, the doing of which does not involve the question of the profitableness of the operation of the railroad as an entirety. The difference between the two cases is illustrated in *St. Louis &c. Ry. Co.* v. *Gill,* 156 U. S. 649, and *Minneapolis & St. Louis R. R. Co.* v. *Minnesota,* 186 U. S. 257. But even if the rule applicable to an entire rate scheme were to be here applied, as the findings made below as to the net earnings constrain us to conclude that adequate remuneration would result from the general operation of the rates in force, even allowing for any loss occasioned by the running of the extra train in question, it follows that the order would not be unreasonable, even if tested by the doctrine announced in *Smyth* v. *Ames* and kindred cases.

It is insisted that, although the case be not controlled by the doctrine of *Smyth* v. *Ames,* nevertheless the arbitrary and unreasonable character of the order results from the fact that to execute it would require the operation of a train at a loss, even if the result of the loss so occasioned would not have the effect of reducing the aggregate net earnings below a reasonable profit. The power to fix rates, it is urged, in the nature of things, is restricted to providing for a reasonable and just rate, and not to compelling the performance of a service for such a rate as would mean the sustaining of an actual loss in doing a particular service. To hold to the contrary, it is argued, would be to admit that a regulation might extend to directing the rendering of a service gratuitously or the performance of first one service and then another and still another at a loss, which could be continued in favor of selected interests until the point was reached where by compliance with the last of such multiplied orders the sum total of the revenues of a railroad would be reduced below the point of producing a reasonable and adequate return. But these extreme suggestions have no relation to the case in hand. Let it be conceded that if a scheme of maximum rates was imposed by state authority,

as a whole adequately remunerative, and yet that some of such rates were so unequal as to exceed the flexible limit of judgment which belongs to the power to fix rates, that is, transcended the limits of just classification and amounted to the creation of favored class or classes whom the carrier was compelled to serve at a loss, to the detriment of other class or classes upon whom the burden of such loss would fall, that such legislation would be so inherently unreasonable as to constitute a violation of the due process and equal protection clauses of the Fourteenth Amendment. Let it also be conceded that a like repugnancy to the Constitution of the United States would arise from an order made in the exercise of the power to fix a rate when the result of the enforcement of such order would be to compel a carrier to serve for a wholly inadequate compensation a class or classes selected for legislative favor even if, considering rates as a whole a reasonable return from the operation of its road might be received by the carrier. Neither of these concessions, however, can control the case in hand, since it does not directly involve any question whatever of the power to fix rates and the constitutional limitations controlling the exercise of that power, but is concerned solely with an order directing a carrier to furnish a facility which it is a part of its general duty to furnish for the public convenience. The distinction between an order relating to such a subject and an order fixing rates coming within either of the hypotheses which we have stated is apparent. This is so because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result. It follows, therefore, that the mere incurring of a loss from the performance of such a duty does not in and of itself necessarily give rise to the conclusion of unreasonableness, as would be the case where the whole scheme of rates was unreasonable under the doctrine of *Smyth* v. *Ames* or under the concessions made in the two propositions we have stated. Of course, the fact that the furnishing of a necessary

facility ordered may occasion an incidental pecuniary loss is an important criteria to be taken into view in determining the reasonableness of the order, but it is not the only one. As the duty to furnish necessary facilities is coterminous with the powers of the corporation, the obligation to discharge that duty must be considered in connection with the nature and productiveness of the corporate business as a whole, the character of the services required, and the public need for its performance. A similar contention to the one we are considering was adversely passed upon in *Wisconsin &c. Ry. Co.* v. *Jacobson, supra.* That case involved the enforcement of an order of a state railroad commission directing a railroad company to acquire the necessary land and make a track connection for the purpose of affording facilities for the interchange of business with another road. The court, after holding that the order was not so unjust and unreasonable as to be repugnant to the Constitution of the United States, disposed of the contention that the order was void because compliance with it would necessitate the incurring of expense, by saying (179 U. S. 302):

"Although to carry out the judgment may require the exercise by the plaintiff in error of the power of eminent domain, and will also result in some, comparatively speaking, small expense, yet neither fact furnishes an answer to the application of defendant in error. *Worcester* v. *Norwich & W. R. Co.,* 109 Massachusetts, 112; *People ex rel. Green* v. *Dutchess & C. R. Co.,* 58 N. Y. 152, 163; *People ex rel. Kimball* v. *Boston & A. R. Co.,* 70 N. Y. 569; *People* v. *New York, L. E. & W. R. Co.,* 104 N. Y. 58, 67."

*Affirmed.*