THE STATE ex rel. MO. PAC. RY. CO. et al., Appellants, v. JOHN M. ATKINSON et al., Commissioners and Members of the Public Service Commission.

In Banc, January 29, 1917.

1. **SLEEPING CAR: Power of Public Service Commission.** The Public Service Commission is given power by statute to require railroad companies, under a proper state of facts, to furnish sleeping cars for the transportation of passengers, either for their "comfort or convenience" or as an "adequate" equipment or service.

2. ———: ———: **Necessity.** Sleeping cars on railroads cannot be classed as mere conveniences or luxuries. They have become necessities of modern industrial, commercial and social life; and as such, under a proper state of facts, the Public Service Commission may compel a railroad company to supply them as an adequate passenger transportation equipment.

3. ———: ———: **Facts Showing Necessity.** A showing made by complainant that for nearly thirty years the railroad company maintained a sleeping-car service on its railroad from Pleasant Hill to Joplin and that there has been an increase in population, is sufficient to call from the railway company a clear showing as to the loss if any resulting from maintaining the service; and where, under such conditions, no condition that lessens the necessity for the sleeping car service is shown, and the only excuse for discontinuing the service is that for a little longer than three months the sleeping car had earned only about one-half the rental charge the company had to pay for its use, but that showing takes into account only the amounts it earned on the branch line between Pleasant Hill and Joplin and not what it earned between Pleasant Hill and Kansas City and between Pleasant Hill and St. Louis, the Public Service Commission was justified in making an order requiring the company to furnish a sleeping car for one year, and to keep an account of its full earnings, and permitting it, if it wished, to make application at the end of the year for a change in the order.

4. ———: ———: **Loss on Branch Line.** If a sleeping car on the branch line of a railroad is necessary for the comfort or convenience of the traveling public, the fact that before its discontinuance it was operated at a financial loss, will not render unreasonable an order of the Public Service Commission requiring its installation, if the whole service of its class and kind on tne entire railroad is profitable. The fact that a sleeping-car service on a branch line, or other isolated portions of the system, results in pecuniary loss, is only one of many facts to be considered in determining the reasonableness of an order requiring the service. It will not of itself render the order invalid.

5. **PUBLIC SERVICE COMMISSION: Party to Order: Notice: Untimely Objection.** An objection that the receiver of a railroad, required by the order of the Public Service Commission to install a sleeping-car service over a branch line, was not brought before the commission by proper notice, made for the first time in the motion for a new trial in the circuit court, comes too late. The statute declares that no such objection shall be considered unless set forth in the application for a rehearing by the commission.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,* Judge.

AFFIRMED.

*James F. Green* and *H. H. Larimore* for appellant.

(1) No common-law duty requires a railroad company, in the performance of its obligations as a common carrier, to transport, with its passenger trains, either express or sleeping cars, and, in the absence of a statute requiring such service, it has a legal right to refuse to provide such accommodations. Coleman v. Pac. Railroad, 89 Atl. 87; D. & R. G. Railroad v. Wahn, 11 L. R. A. (N. S.) 432, 89 Pac. 39; Russell v. Railroad, 61 N. E. 678; McDermon v. Railroad, 122 Fed. 669. (2) There is no statute in force in this State requiring carriers to transport sleeping cars attached to their passenger trains, and a proper construction of the act creating the Public Service Commission and defining its powers gives the commission no authority to require such service. McDermon v. Railroad, 122 Fed. 669; State ex rel. v. Thompson, 36 Mo. 70; State ex rel. v. Gammon, 76 Mo. 426; Shaw v. Railroad, 101 U. S. 565. (3) Transportation means a taking up of persons or property at one point and putting them down at another. Ferry Co. v. Pennsylvania, 114 U. S. 196. (4) The order of the commission in this case as to B. F. Bush, Receiver, was made without notice, without opportuntiy to be heard and without said Bush having been made a defendant, and to enforce such an order would be the taking of property without due process of law. Ballard v. Hunter, 204 U. S. 241; Railroad v. Iowa, 160 U. S. 389. (5) The order made in this case is not justified by public neces-

sity, and is, therefore, the taking of property without due process of law. Also the enforcement of the order made by the commission will burden relators with great expense and bring them no revenue. State ex rel. v. Fairchild, 224 U. S. 510; Railroad v. North Carolina Comm., 206 U. S. 267; Mo. Pac. Railroad v. Kansas, 216 U. S. 262.

*Alex Z. Patterson* and *James D. Lindsay* for respondents.

(1) Under the provisions of the Public Service Commission Act, the commission has the authority to require companies operating railways in this State to place sleeping cars in service on their lines. Public Service Commission Act 1913; subdivisions 2, 24 and 26 of section 2; sections 26, 27 and 43; paragraph 1 of section 16; paragraph 2 of section 47; sections 49 and 51; and section 127. Railroad v. Public Service Comm., 75 W. Va. 100, 83 S. E. 286. (2) The order made by the commission was in the nature of a test, an interlocutory order, a reasonable and practicable method of ascertaining the very truth of the matter, and such an order should not be set aside upon uncertain grounds, nor except on the clearest evidence, nor until the test shall have been made. Holabird v. Railroad Comm., 154 Pac. 831; Des Moines v. Gas Co., 238 U. S. 173; Railroad v. Towers, 126 Md. 54; Traction Corp. v. Trenton, 227 Fed. 502; Knoxville v. Water Co., 212 U. S. 1; Willcox v. Gas Co., 212 U. S. 54. (3) An order requiring the railroad company to furnish sleeping car service, though at a loss, is not necessarily nor conclusively for that reason invalid nor unreasonable, since consideration must be given to the company's returns as a whole, the degree of convenience to the public, and the reasonableness of the demand for the service, under all the facts in the particular case. State v. Railroad, 239 Mo. 234; Railroad v. Railroad Comm., 152 Wis. 654; Railroad v. Railroad Comm., 54 Colo. 64; Railroad v. North Carolina Comm., 206 U. S. 1. (4) It is not essential that a profit be derived from each and every particular kind of service rendered by a

railroad company. An order to do a particular act not involving the question of the profitableness of the operation of the railroad as an entirety, though the doing of the act specified may entail some loss, is not void, unless it be so inherently unjust and unreasonable as to amount to a deprivation of property without due process of law, or a denial of the equal protection of the laws. Railroad v. North Carolina Comm., 206 U. S. 24; Railroad v. Minnesota, 186 U. S. 257; Railroad v. Jacobson, 179 U. S. 287. (5) The appellants cannot in this court urge or rely on any ground not specifically set forth in the application before the commission for a rehearing. Public Service Commission Act 1913, sec. 110.

GRAVES, C. J.—Since 1872 the Missouri Pacific Railway Company has owned and operated a line of railroad from Joplin, Missouri, to Pleasant Hill, Missouri, at which point it connected with the main line from St. Louis to Kansas City. During most of this long time and up to about April 11, 1915, it maintained a Pullman car service, by having a Pullman car attached to one of its trains leaving St. Louis, and by having this car detached at Pleasant Hill, and then attached to a train running from Kansas City to Joplin. A like arrangement was had for east-bound passengers, by having a Pullman car attached to a Kansas City train at Joplin, and detached at Pleasant Hill, and there attached to a St. Louis train. The taking off of this Pullman service was the occasion of a complaint by the Business Men's League of Carthage against the railway. company, before our Public Service Commission, which made a provisional order requiring said company to retain such Pullman service, for a period beginning December 15, 1915, and until such order was revoked or set aside by the said commission. The sixth clause of such order reads:

"Order 6. That defendant, Missouri Pacific Railway Company, and Benjamin F. Bush, Receiver, shall have the right at the end of one year from the 1st day of January, 1916, to file with the commission an account in

detail showing the number of passengers carried and all receipts and expenditures arising from furnishing the service for that period, and shall also have leave at that time to move that this order be set aside. That the commission shall retain jurisdiction of the case for the purpose of making such further orders as may be necessary."

The evidence taken before the commission is not flush with facts upon either side as to the earnings of the Pullman car used in this service. The complainant proved the continuous service for nearly thirty years, and in addition proved that when the railway company was in fact competing against the Frisco line for passenger business from Joplin and Carthage to St. Louis, it got its share, but that of late no effort had been made for such business, because of the much better time made by the Frisco, over the present slower schedule of the Missouri Pacific Company. On page 3 of relator's brief, its side of the controversy is thus stated:

"On part of the railway company it was shown that the sleeper which was taken off was the property of the Pullman Company; that the latter company exacted six thousand dollars a year from the railway company for the use of each sleeper in the service, and if all of the sleepers in use did not average a return of six thousand dollars the difference had to be made up by the railway company. It was further shown that the sleeping car in controversy earned per trip during January, February, March and April, 1911, the following sums: $7.75, $9.32, $8.32 and $7.67, respectively, leaving a deficit to be paid the Pullman Company each trip of $8.69, $7.12, $8.12, and $8.77."

These figures, however, must be explained. They are not the total earnings of the car. They only include Pullman service of passengers from St. Louis and points between St. Louis and Pleasant Hill, on the west-bound trip, where such passengers went beyond Pleasant Hill and toward Carthage or Joplin. To be explicit, if five passengers at St. Louis took this Pullman car (which for convenience we shall call the Joplin Pullman), one destined to Jefferson City, one to Sedalia, one to Warrensburg, one to Pleasant Hill, and one to either Har-

risonville, Butler, Nevada, Lamar, Carthage or Joplin, only the one going south from Pleasant Hill was counted, and the other four were not counted. So, too, as to the east-bound trip; if the passenger took this Joplin Pullman at any point south of Pleasant Hill, the Pullman fare was counted in these figures; but the car might be loaded to the brim at Pleasant Hill and points east, and their fares were not counted.

Under these rather unsatisfactory facts the commission made the provisional order stated above. Upon *certiorari* to the circuit court of Cole County, that order was sustained and affirmed, and by *certiorari* here it is sought to quash the judgment of said circuit court. Points urged (and additional facts if required) will be noted in the course of the opinion.

I. The first point urged, is that the Public Service Commission has no power to order sleeping car service from railroad companies. Relator concedes that such commission has the power to order an adequate number of trains and an adequate number of cars to accomodate the public, but draws the line on sleeping cars, on the theory that they are not necessities, but mere conveniences or luxuries.

*Sleeping Cars: Convenience.*

The jurisdiction of the Commission over railroads is firmly fixed by the statute creating the Commission. The Act of 1913 (Sec. 16, Laws 1913, p. 565) says:

"The jurisdiction, supervision, powers and duties of the Public Service Commission herein created and established shall extend under this act:

"1. To all railroads within this State, and to all transportation of persons or property thereon, and to the person or corporation owning, leasing, operating or controlling the same."

Note the term "transportation of persons" as used in the above grant of power. The law-makers did not leave the meaning of these words in doubt, nor did they leave them for judicial construction. They have defined

their meaning by the act itself. Paragraph 24 of section 2 of the Act of 1913 (Laws 1913, p. 560) reads:

"24. The term 'transportation of persons,' when used in this act, includes every service in connection with or incidental to the safety, *comfort or convenience* of the person transported and the receipt, carriage and delivery of such person and his baggage."

The italics are ours.

Under the definition of "transportation of persons" it is not meant the mere getting of them from one place to another, but there is included the elements of "comfort or convenience." This definition eliminates the idea of mere necessity, although we are not saying that sleeping cars are not a public necessity in this age of the world. That matter we will discuss later. The present purpose is to show that the statutes themselves contemplate more than carriage merely.

Going further as to the jurisdiction or right of the commission to provide for adequate service, we have paragraph 2 of section 47, Act of 1913 (Laws 1913, p. 585), the pertinent part of which reads:

"Whenever the commission shall be of the opinion, after a hearing had upon its own motion or upon complaint, that the regulations, practices, *equipment, appliances or service* of any such common carrier, railroad corporation or street railroad corporation in respect to transportation of persons or property within this State are unjust, unreasonable, unsafe, improper or *inadequate,* the commission shall determine the just, reasonable, safe, *adequate* and proper regulations, practices, *equipment, appliances* and service thereafter to be in force, to be observed and to be used in such *transportation of persons* and property and so fix and prescribe the same by order to be served upon every common carrier."

Further the pertinent portions of section 49 of said act (Laws 1913, p. 588) read:

"If in the judgment of the commission, additional tracks, switches, terminals or terminal facilities, stations, motive power, or any other property, construction, apparatus, *equipment,* facilities or device for use by any

common carrier, railroad corporation or street railroad corporation in or in connection with the transportation of passengers or property ought reasonably to be provided, or any repairs or improvements to or changes in any thereof in use ought reasonably to be made, or any additions or changes in construction should reasonably be made thereto in order to promote the security *or convenience of the public* or employees, or in order to secure adequate service or facilities for the *transportation of passengers* or property, the commission shall, after a hearing, either on its own motion or after complaint, make and serve an order directing such repairs, improvements, changes or additions to be made within a reasonable time and in a manner to be specified therein.''

In all these quotations the italics are ours.

These, and even other portions of the Act of 1913 not quoted, clearly indicate that the commission is not only authorized to see that the railroads are equipped in such manner as will enable them to carry passengers from point to point in the State, but that they are so equipped as to furnish comfort and convenience in the ''transportation of passengers.'' We can't go to common law rules, because they have been supplanted by the statute. We must go to the statute, and under its very terms we are forced to say that the commission under proper circumstances has the power to direct and order sleeping car service.

Even if the statutes granting the powers were not as broad as they are, yet in these days of business activities, it can be said that sleeping cars have passed the point of mere conveniences and reached the point of public necessities. We can't measure public necessities by the old rules. What years ago were deemed only luxuries are today public necessities. Thus we have held that telephones in public offices are public necessities and must be paid for out of public funds. [Motley v. Pike County, 233 Mo. l. c. 46.]

What were mere luxuries years ago have by constant uses, practices and advanced business thought, become necessities of today. The idea is well expressed by the

Public Service Commission of West Virginia in case of Public Service Commission v. Railroad, P. U. R. 1916-E, l. c. 364, whereat it is said:

"It is said that this proposed additional sleeper service is not a necessity, but only a convenience. That it is not an absolute necessity is true. No sleeping car is. No dining or parlor car is. Our fathers had none of them. If they traveled at night they slept in their seat in the day coach. As for meals, they took their lunches with them, or got their meals at the places where the train stopped 'twenty minutes for dinner' or other meal. We can at this day get along without sleeping cars. We can travel as our fathers did. If there were no such cars everybody would be on a parity in that respect. Necessity and convenience are relative terms. What was a mere convenience a few years ago may now, in this age of telegraphs and telephones, become a practical necessity. The matter is affected by time, circumstances, custom, conditions and the state of society."

Our statutes are much broader that the West Virginia statutes. By them the convenience of passengers as well as the absolute necessities may be considered. There is, therefore, nothing in the point made that the commission of Missouri is without authority under any circumstances to direct sleeping car service. Under a proper state of facts our Public Service Commission is fully empowered to order sleeping car service. The only question is, do the facts in this case justify the conditional order made? That question we take next.

II. The only serious question in this case is the sufficiency of the evidence, and when properly considered we do not think that there can be a doubt about that point. The evidence for the complainant shows that this sleeping-car service was maintained for nearly thirty years. This is some evidence of its necessity. It will not be presumed that the railway company would for thirty long years continue the doing of an unnecessary

*Facts Requiring Sleeping Cars.*

act. No condition is shown that would change the necessity for this sleeping-car service, if there was such necessity, during those thirty years. The census reports, of which we take judicial cognizance, show an increase rather than a decrease in population in that territory. In Jasper County, under record in this case, we have Joplin with a population of 32,078; Webb City with 11,817; Carterville with 4,539, Carthage with 9,483 and Jasper with 664. In Barton County we have Lamar with 3,216. In Vernon there is Nevada with 7,175. In Bates County we have Butler with 2,894, and not in the record, but of which we take notice, Rich Hill with more, and Adrian with near 1000. In Cass County is Harrisonville with 1,947, and other smaller towns. All these on the line of this railway and all south of Pleasant Hill, and all affected by the discontinuance of the sleeping-car service.

The only thing shown by the railway is the sleeping-car earnings for the three months and eleven days just prior to a discontinuance of the service. From this showing it appears that the car was earning some $3000 less than the $6000 per year, which the railroad was paying for the car. The brief in this case admits that the car contract with the Pullman Car Company for service required the railroad to make all the sleeping-cars in use average $6000 per annum, but the contract did not require the railway company to make up the deficit on any particular car, if all the cars used, taken together, averaged $6000 per year. In our statement we have quoted the substance of this contract from the brief of the railway company.

It must be kept in mind that the railway company, although it was no doubt possessed of the facts, did not show the whole earnings of this Joplin sleeper. If going west this sleeper was used by passengers from any point between St. Louis and Pleasant Hill, no account was given of those earnings. So too on the eastern trip; if this car was used by passengers getting on at Pleasant Hill or points east thereof no account was given of such earnings.

The showing made by complainant was sufficient to call from the railway company a clear showing as to the loss if any entailed by maintaining this service, and this the company has not undertaken to do. We do not mean to say that even if some loss had been shown the order made would not be sustained, but what we do mean to say is, that the railway company should have shown the actual earnings of this car, and not contented itself with the meager showing made. Nor will a showing for a small fragment of time suffice.

Under the facts the commission was justifiable in making the order which was entered. This order required them to run such car for a year, and during such time keep an account of the full earnings of that particular car, and then gave the company, thus armed with all the facts, the right to file a motion for a change of the order. The order made, in view of all the facts, is a reasonable one, and should be upheld. If at the end of the year the full showing is such as to indicate that there should be a change in the order, we have no doubt that the commission will make a proper order.

III. But we had best notice another matter. From Pleasant Hill to Joplin is a branch line of the railway company. We do not understand the

Sleeping Cars on Branch Lines.

rule to be that the service upon these branch lines, must of necessity be self-sustaining, before the commission can compel the service, provided the service is necessary for the "comfort or convenience" of the traveling public. Branch lines, when considered alone, often are not money-makers, but when considered as feeders to a main line, add to the general profit of the company. In other words, slight pecuniary loss on a given service, which service is demanded by the "comfort or convenience" of the public, will not render an order for such service bad, if the whole service on the railroad of that class and kind is profitable. In Atlantic Coast Line Railroad Co. v. North Carolina Corporation Commission, 206 U. S. 1, the syllabus, which fairly reflects the opinion, reads:

"It is within the power of a state railroad commission to compel a railroad company to make reasonable connections with other roads so as to promote the convenience of the traveling public, and an order requiring the running of an additional train for that purpose, if otherwise just and reasonable, is not inherently unjust and unreasonable because the running of such train will impose some pecuniary loss on the company."

In State v. Railroad, 239 Mo. 1. c. 234, this court said:

"Loss to a railroad is no defense to a petition for a mandamus to compel obedience to such a law. [State to use v. Railroad, 83 Mo. 144, 150; Railroad v. Bristol, 151 U. S. 556; Railroad v. Ohio, 173 U. S. 285; Railroad v. Corporation Commission, 206 U. S. 1.]

So also in Railway v. Railroad Commission, 152 Wis. 1. c. 673, it is said:

"The evidence shows that to put on an extra local train each way daily would cost about $7000 per month and that the estimated receipts would not equal the expense. It is not shown, however, that the whole passenger revenue of the road in this State is not ample to meet the additional expense with a fair margin of profit. But even if that were not so, if the service required is a reasonable one it is no answer to say that it would have to be performed at a financial loss. In Atlantic Coast Line R. Co. v. North Carolina Corp. Comm., 206 U. S. 1, 26, the court says: 'Because as the primal duty of a carrier is to furnish adequate facilities to the public, that duty may well be compelled, although by doing so as an incident some pecuniary loss from rendering such service may result.' This is reaffirmed in Mo. Pac. R. R. Co. v. Kansas, 216 U. S. 262. In determining what is reasonably adequate service the paramount factor is public need and convenience, modified no doubt by many other considerations, such as the size of the station, the extent of the demand for transportation, as well as the reasonable cost of giving additional service."

In Railway Co. v. Railroad Commission, 54 Colo. 1. c. 93, it is said:

"The law imposes upon it the duty of furnishing adequate facilities to the public on its entire system, not a part; and it cannot be excused from performing its full duty merely because, by ceasing to operate a part of its system, the net returns would be increased; so that it cannot be said under the facts, that requiring plaintiff in error to perform its duty to the public by furnishing an adequate service over its line between Denver and Leadville, although a pecuniary loss is entailed, is unreasonable or deprives it of any constitutional right, either Federal or State. [Mo. Pac. Ry. Co. v. Kansas, 216 U. S. 262; Atl. Coast Line R. R. Co. v. N. C. Corp. Com., 206 U. S. 1; Corporation Comm. v. Railroad, 137 N. C. 1.]

"In brief, under the facts of the case at bar, an order requiring a railroad company in the possession and enjoyment of its charter powers and privileges, to furnish a necessary service, does not, even though a compliance with the order entail a loss, deprive it of its property without due process of law, or compel it to devote its property and revenues to a public use without just compensation, for the obvious reason that such an order merely requires it to discharge its legal obligations. Of course, that a service ordered will entail a loss is a circumstance to consider in determining the reasonableness of the order; but a common carrier cannot successfully complain that a loss will thus be occasioned when it appears that the ordered service requires nothing more than necessary transportation facilities."

This seems to be the general trend of modern authority. If as we have concluded, in this day of transportation, sleeping-car service is necessary for the "comfort or convenience" of the traveling public, then mere loss on one portion of such service on a branch line, would not of necessity invalidate an order for the service. The whole service of the particular kind and character must be considered, and not isolated portions of it. The fact that an isolated portion did not pay would only be one of many facts to be considered in determining the reasonableness of the order.

IV. Lastly it is urged that Mr. Bush, the receiver of the railway company, was never brought before the commission by proper notice. This question was raised for the first time in the motion for rehearing in the circuit court. It comes too late.

But beyond this the law determines this claim adversely to the railway company. Mr. Bush was included in the order made by the commission. After this the parties filed their motion for rehearing before the commission as by the law required. [Sec. 110, Laws 1913, p. 640.] That section provides, among other things, that: "No corporation or person or public utility shall in any court urge or rely on any ground not so set forth in said application."

**Party to Order.**

The point here urged was not made in the application for a rehearing before the commission. The clause was put into the law for a purpose. That purpose was to give the commission a fair chance to correct its own error. Had it been suggested that Mr. Bush was not properly before the commission, proper steps could have been taken by the commission. The railway company cannot rely upon this point now. The judgment of the circuit court should be and is affirmed. All concur except *Bond, J.,* who dissents.

PER CURIAM:—The foregoing opinion of GRAVES, P. J., in Division No. One is adopted as the opinion of the Court In Banc. All concur, except *Bond, J.,* who dissents and *Williams, J.,* not sitting.