THE PENNSYLVANIA RAILROAD COMPANY, A CORPORA-TION OF THE COMMONWEALTH OF PENNSYLVANIA, APPELLANT, v. THE BOARD OF PUBLIC UTILITY COM-MISSIONERS OF THE STATE OF NEW JERSEY, RE-SPONDENT.

Argued November 17, 1952—Decided December 22, 1952.

46

Mr. *Edward J. O'Mara* argued the cause for the appellant (*Messrs. O'Mara, Schumann, Davis & Lynch* and *Messrs. Starr, Summerill & Davis,* attorneys; Mr. *William F. Hyland* and Mr. *Windsor F. Cousins* of the Pennsylvania Bar on the brief).

Mr. *James M. Davis, Jr.,* argued the cause for the respondent (Mr. *Theodore D. Parsons,* Attorney-General, Mr. *Albert McCay,* Mr. *Thomas D. Begley* and Mr. *Sidney W. Bookbinder,* attorneys; Mr. *John R. Sailer* on the brief).

The opinion of the court was delivered by

OLIPHANT, J. This is an appeal from an order of the Board of Public Utility Commissioners dated April 23, 1952, which denied an application of the Pennsylvania Railroad Company to discontinue certain local commuter trains designated as No. 2591, No. 2594, No. 2592 and No. 2593 on what is known as the Trenton-Burlington-Philadelphia line of the applicant.

The application involved the discontinuance of two local commuter trains in each direction each day; two being operated westbound in the morning and two operated east-

bound in the evening. The trains operated from and to Trenton and made stops at Broad Street, Trenton; Bordentown; Roebling; Florence; Burlington; Edgewater Park; Beverly; Perkins; Delanco; Riverside; Cambridge; Riverton; Palmyra; Arch Street, Palmyra; and Delair in New Jersey. Prior to the abandonment of the Broad Street Station in Philadelphia on April 27, 1952 these trains ran into that terminal from Delair by way of Frankford Junction, and subsequent to April 27, 1952 they have been operated between Trenton and Frankford Junction with connecting service on the railroad's main line between Frankford Junction and the Pennsylvania Station at 30th Street and the suburban station at 16th Street, Philadelphia, Pa.

Four days after the order under appeal was entered Broad Street Station was abandoned on April 27, 1952, pursuant to an order of the Pennsylvania Public Utilities Commission. Apparently there is no approval or authorization by the Interstate Commerce Commission for the abandonment of the line running from the Delair Bridge into the Broad Street Station, since the railroad has taken the position that no such order of the Interstate Commerce Commission is required under 49 *U. S. C. A., section* 1, *paragraph* 18.

The history of this part of the Pennsylvania Railroad system is that in 1830 the Camden & Amboy Railroad and Transportation Company was incorporated by the Legislature and the chartering act required the railroad to use a ferry service at each end of its line. *L.* 1829, *p.* 83. For the purposes of this case the ferry service involved would be at Camden, and for many years this line ran directly to Camden and connected with the ferry service. In 1894 certain companies were incorporated both in New Jersey and Pennsylvania for the purpose of constructing the Delair Bridge and creating an interstate connection with the Camden & Amboy Railroad and Transportation Company. These two companies merged into a New Jersey corporation known as the Delaware River Railroad and Bridge Company, and in 1896 it leased the bridge and line to the Pennsyl-

vania Railroad Company for a term of 999 years. By merger and consolidation the Pennsylvania Railroad Company since 1871 has exercised and enjoyed the franchises of the Camden & Amboy Railroad and Transportation Company.

After the opening of the Delair Bridge certain of the trains, including those in question, no longer had their terminus in Camden but crossed the bridge and continued on to the Broad Street Station in Philadelphia. Other trains on this line still continued to operate into the Broadway Station and the Federal Street terminal of the railroad in Camden, a distance of 5.4 miles from the Delair Bridge.

While the obligation of the Pennsylvania Railroad through its lessors required it to carry passengers to Camden and then by ferry to Philadelphia, there is no such charter obligation to do so by way of the Delair Bridge. The ferry service was operated and maintained through all these years from Camden to Philadelphia until April 1, 1952, a short time before the order under attack here was made. It was discontinued on that day pursuant to an order of the Interstate Commerce Commission, but we are not informed of the ground of this order.

The proofs in this case were submitted to the Board on the basis of the trains running into the Broad Street Station. These proofs show that the Board found that the four Philadelphia trains proposed for discontinuance are among the seven most heavily patronized of the 13 trains operating on this particular line. The Board further found that the failure to earn an adequate return from the passenger service operated on the line was not of itself a sufficient reason for the discontinuance of these four trains; that the recent extraordinary industrial and residential development under way in the territory through which this line passes may reasonably be expected to result in a substantial increase in the number of passengers using the line, including these four trains, and in the volume of freight which will probably be carried in the future. The Board came to the conclusion that on the proofs submitted the record did not establish that

the reasonable requirements of public convenience and necessity for such service would permit the discontinuance of these trains. As to these findings on the proof as proffered we find that they are reasonably supported by such evidence.

The Board made a further finding that the handling of steam powered trains at the 30th Street Station in Philadelphia presents a serious but not insuperable problem of operation, and then in accordance with its finding entered the following order:

"HEREBY DENIES permission to discontinue the service in question and HEREBY ORDERS The Pennsylvania Railroad Company to continue the operation of daily except Saturday, Sunday and holiday trains No. 2591 and No. 2594, and of daily except Sunday and holiday trains No. 2592 and No. 2593 on the Trenton-Burlington-Philadelphia line.

> BOARD OF PUBLIC UTILITY COMMISSIONERS,
> By:
> (Signed) JOHN E. BOSWELL,
> President.

Dated: April 23, 1952."

The railroad's first contention is that the order of the Board of Public Utility Commissioners is invalid in that it in effect directs it to operate trains beyond the territorial limits of the State of New Jersey. It is fundamental that the authority of every tribunal is necessarily restricted by the territorial limits of the state in which it is established. *Pennoyer v. Neff,* 95 *U. S.* 714, 24 *L. Ed.* 565 (1877). But the rule of territorial limitation is not so sweeping that a state cannot through a regularly established tribunal regulate the intrastate operations of an interstate carrier. *Colorado v. United States,* 271 *U. S.* 153, 162, 46 *S. Ct.* 452, 454, 70 *L. Ed.* 878 (1926). In that case it was aptly said:

"This railroad, like most others, was chartered to engage in both intrastate and interstate commerce. The same instrumentality services both. The two services are inextricably intertwined. The extent and manner in which one is performed necessarily affects the performance of the other. Efficient performance of either is dependent upon the efficient performance of the transportation system

as a whole. Congress did not, in the respect here under consideration, assume exclusive regulation of the common instrumentality as it did in respect to coupling devices."

The court also pointed out that the sole objective of 49 *U. S. C. A., section 1, paragraphs* 18 to 20, is the regulation of interstate commerce, and such control is primal and is exercised over intrastate commerce only because such control is a necessary incident of freeing interstate commerce from the unreasonable burdens, obstructions or unjust discrimination which are found to result from the operation of a branch at a large loss.

■ Thus it has been held that the Interstate Commerce Commission has exclusive jurisdiction over the abandonment of a branch line under these sections but that it has no jurisdiction over a proposed partial discontinuance of service on such lines. *Colorado v. United States, supra; Alabama Public Service Commission v. Southern Railway,* 341 *U. S.* 341, 71 *S. Ct.* 762, 95 *L. Ed.* 1002 (1951). It has likewise been held the Interstate Commerce Commission has no authority under this section to authorize a discontinuance of such intrastate service. *Palmer v. Commonwealth of Massachusetts,* 308 *U. S.* 79, 60 *S. Ct.* 34, 84 *L. Ed.* 93 (1939); *Application of Kansas City Southern Railroad,* 94 *I. C. C.* 691 (1925); *Application of Morris & Essex Railroad Co.,* 175 *I. C. C.* 49 (1931); *Application of New York Central Railroad Co.,* 254 *I. C. C.* 745, 763 (1944).

■ It is clearly within the competency of the Board of Public Utility Commissioners of this State to determine the question whether or not the intrastate business of this carrier on this particular line is required by public necessity. *Cf. O'Connor v. Board of Public Utility Commissioners,* 129 *N. J. L.* 263 (*E. & A.* 1942); *Penna.-Reading S. S. Lines v. Board of Public Utility Commissioners,* 5 *N. J.* 114 (1950).

■ One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public, and this duty arises out of the acceptance and enjoyment of the powers granted

by the State and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them and its performance cannot be avoided merely because it will be attended by some pecuniary loss. The local factor of public need of the services rendered is the predominating and controlling element. *Chesapeake & Ohio Railroad v. Public Service Commission of West Virginia,* 242 *U. S.* 603, 37 *S. Ct.* 234, 61 *L. Ed.* 520 (1917); *Alabama Public Service Commission, v. Southern Railroad Co., supra; Pennsylvania-Reading S. S. Lines v. Board of Public Utility Commissioners,* 5 *N. J.* 114, at *page* 129 (1950).

The United States Supreme Court in several instances has upheld orders of the public utility boards in the various states where such boards found that even though intrastate services were being rendered at an economic loss their continuance was necessary because of the public need for the services in the particular area, and in each of these cases the terminal facilities were located in other states, some trains were interstate trains.

In *Missouri-Pacific Railroad v. Kansas,* 216 *U. S.* 262, 30 *S. Ct.* 330, 54 *L. Ed.* 472 (1910), the order of the state commission was that the railroad be required to run a separate train for passengers to the state line of the State of Kansas rather than a mixed train for passengers and freight, which the railroad had been running to a terminal in the Town of Butler in the State of Iowa. This order was affirmed, and it apparently was no concern of the United States Supreme Court that there were no terminal facilities at the state line, although in that case apparently the railroad had elected to continue the train to the Butler terminal in the other state. ·

In *Alabama Public Service Commission v. Southern Railroad, supra,* the railroad sought to discontinue trains No. 7 and No. 8 operating daily between Tuscumbia, Ala. and Chattanooga, Tenn., a distance of 145 miles mainly within Alabama, on the ground that the out-of-pocket loss amounted to a confiscation of its property in violation of the due

process clause. The state court held that the continuance of these trains was necessary by reason of the public necessity for such service and therefore denied the application insofar as the intrastate feature was concerned. The order of the Alabama commission is not set forth in the case but it is not to be assumed that it was more extensive than the territorial limitations of the State of Alabama. But the United States Supreme Court nevertheless reversed a judgment of the District Court which in turn had reversed the order of the Alabama commission. The court found as a fact that the denial of the application was reasonable under all the circumstances. Justice Frankfurter in his concurring opinion said:

"This litigation seems to have been concerned almost exclusively with the operations of Trains 7 and 8. No showing whatever was made that by the loss incurred in running these trains Southern was deprived of that protection for its investment in Alabama which alone can be made the basis of a claim under the Due Process Clause of the Fourteenth Amendment. * * * The lack of merit in the plaintiff's case is so clear that it calls for dismissal of the complaint." [341 *U. S.* 341, 71 *S. Ct.* 771.]

The majority opinion pointed out that it was unnecessary to consider any impact that the order of the Alabama Public Service Commission might have on interstate commerce because that was not before the court, since the railroad had not invoked the jurisdiction of the Interstate Commerce Commission under 49 *U. S. C. A., section* 13(4) for decision as to whether this intrastate service constitutes an undue discrimination against interstate commerce. Citing *Western & Atlantic Railway Co. v. Georgia Public Service Commission,* 267 *U. S.* 493, 45 *S. Ct.* 409, 69 *L. Ed.* 753 (1925), and the cases cited there.

In a companion case, *Alabama Public Service Commission v. Southern Railroad,* 341 *U. S.* 363, 71 *S. Ct.* 775, 95 *L. Ed.* 1016 (1951), the problem involved was the discontinuance of two passenger trains Nos. 11 and 16 operated daily between Birmingham, Ala. and Columbus, Miss. The discontinuance of these trains had been allowed by a blanket order of the

Interstate Commerce Commission along with other trains. This order subsequently was rescinded and the other trains restored to operation, but the railroad apparently had refused to restore trains Nos. 11 and 16 on the ground of the costly out-of-pocket operation loss of the trains. The Alabama commission made a finding as to the reasonable necessity of the operation of these trains from an intrastate standpoint. The order was denied on the ground that the public need existed for the services and that the appellee had not made a sufficient effort to reduce losses through more economical operating methods. This judgment was affirmed for the same reasons as stated in *Alabama Commission v. Southern Railway, supra*. See also *Southern Railway Co. v. South Carolina Public Service Commission*, 31 *F. Supp.* 707 (*D. C. S. C.* 1940).

From these decisions it is clear that the State Board of Public Utility Commissioners in this State had adequate jurisdiction to determine the question as presented to it and there is evidence in the record to sustain the order to the extent that it denies the suspension or discontinuance of these four trains on an intrastate basis in view of the public necessity and convenience. The order is therefore valid to the extent that it requires the railroad to supply such services to the territorial limits of the State of New Jersey, and we further find that on the proofs there is no taking of property without due process under the Fourteenth Amendment.

As in the *Alabama* case, *supra,* at this juncture in this cause the question whether such an order would be an undue burden on interstate commerce has not been raised, but as pointed out in that case such a question must be originally litigated before the Interstate Commerce Commission under 49 *U. S. C. A., section* 13. It is not a question for the courts. *Western & Atlantic Railway Co. v. Georgia Public Service Commission, supra,* 267 *U. S.* at *page* 497, 45 *S. Ct.* 409.

The finding of the Board "(4) That the four trains provide a convenient and the only direct rail service from

the river towns into the City of Philadelphia during commuter hours"; and "(8) That handling of steam powered trains at the 30th Street Station in Philadelphia presents serious but not insuperable problems of operation"; are findings of fact which may not support an order directing the operation of the trains beyond the state line. The resolution of such questions may be within the jurisdiction of the Interstate Commerce Commission under 49 *U. S. C. A., section* 13, if properly raised.

It is assumed that for present purposes the railroad will continue to operate these four trains voluntarily to Frankford Junction pending final disposition of this cause. However, it should be obvious that by the abandonment of the Broad Street Station pursuant to the order of the Pennsylvania Utility Commission the proofs upon which the order as modified is based are no longer factually existent, and the question of public necessity and convenience presently existent with respect to the line can only be determined by the facts as they now exist, considering the voluntary operation of the line to Frankford Junction and the obligation of the railroad company under its charter to provide such service as is necessary to Philadelphia within this State.

No order entered by the Board of Public Utility Commissioners of the State of Pennsylvania with respect to the operation of these four trains within the territorial limits of the State of Pennsylvania is binding on the Board of Public Utility Commissioners of this State, although it may develop that such orders are a serious interference with the interchange of commerce and transportation between the states and amount to undue discrimination with respect to interstate commerce under 49 *U. S. C. A., section* 13. Proof as to these orders may be received as to this phase of the case so that the Board of Public Utility Commissioners of this State may determine what steps can be taken, if any, in the premises.

The order of the Board of Public Utility Commissioners is modified and the cause is remanded to be proceeded with

consistent with this opinion for the determination of the public necessity and convenience of these four trains to the state line, or in the alternative, to the terminal stations of the line in the City of Camden in this State.

*For modification and remandment*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*Opposed*—None.