IN THE MATTER OF THE PROPOSAL OF THE NEW JERSEY AND NEW YORK RAILROAD COMPANY TO DISCONTINUE OPERATION OF TRAIN NO. 613 BETWEEN JERSEY CITY, NEW JERSEY, AND SPRING VALLEY, NEW YORK, EFFECTIVE AUGUST 1, 1951.

Argued March 30, 1953—Decided May 4, 1953.

*Mr. Justin W. Seymour* argued the cause for the appellant (*Messrs. Seymour & Seymour,* attorneys; *Messrs. McLanahan, Merritt & Ingraham* of the New York bar, on the brief).

*Mr. Sam A. Colarusso* argued the cause for the respondent Brotherhood of Railroad Trainmen.

*Mr. Maurice A. Walsh, Jr.,* argued the cause for the respondent Boroughs of Park Ridge, Montvale, *et al.* (*Messrs. Fahy & Walsh,* attorneys).

The opinion of the court was delivered by

VANDERBILT, C. J. This is an appeal from a judgment of the Appellate Division of the Superior Court affirming an order of the Board of Public Utility Commissioners denying permission to the New Jersey and New York Railroad Company to discontinue operation of westbound passenger train No. 613 leaving Jersey City, New Jersey, at 4:45 P. M. daily except Saturdays, Sundays and holidays.

The run in question extends from Jersey City to Spring Valley, New York, a distance of 30.7 miles, of which 7.5 miles extends over the main line of the Erie Railroad while the balance of 23.2 miles is over the tracks of the New Jersey and New York Railroad. There are 22 stations on the line, including the two terminals, located in 18 different municipalities. The entire run consumes one hour and 22 minutes. The railroad operates five eastbound morning trains arriving at Jersey City between 6:54 A. M. and 8:35 A. M., and six westbound evening trains that depart from Jersey City between 4:45 P. M. and 6:55 P. M.

The facts developed at the hearing below were uncontradicted. Approximately 80% of the stock of the railroad is owned by the Erie Railroad. Since 1938 its business has been conducted by a trustee in reorganization appointed by the United States District Court under section 77 of the Bankruptcy Act, 11 *U. S. C. A.* § 205. During this entire period the railroad as a whole has been operating at a deficit. In 1950 there was a net passenger operating loss of $218,709 and a net freight operating profit of $53,406, leaving a net railway operating loss of $165,303. In that year the net deficit of the railroad after fixed charges was $209,220 and the figures for the first six months of 1951 indicated a larger deficit for that year.

The average monthly revenue from train 613 is $1,351, while the out-of-pocket operating costs are $4,204 a month, leaving a monthly net operating deficit of $2,853. The number of passengers carried by the railroad has been gradually decreasing in recent years, although figures for the first six months of 1951 show an increase over 1950 in the number of westbound passengers. In fact, train 613 shows an average monthly increase of 13% over 1950. The number of paying passengers carried each trip on train 613 varied from 133 to 145, approximately 95% of whom are commuters.

The railroad proposed to add the coaches from train 613 to the next westbound train leaving Jersey City at 5:13 P. M., or 28 minutes after train 613, on a schedule which would bring the train into Spring Valley 19 minutes after the presently scheduled arrival time of train 613.

The application was opposed by representatives of several of the municipalities involved as well as by the Brotherhood of Railroad Trainmen, some of whose members would be affected if the application were granted. After formal hearings the Board of Public Utility Commissioners denied the application, holding that:

"In passenger train cases, our primary considerations must be the requirements of public convenience and necessity for continuation of a service. In respect to such service we adhere to the view that mere failure to earn a proper return on a line which is part of a system is not sufficient ground for discontinuance of a service.

On the record before us we find:

(1) that considerable public opposition to discontinuance of train No. 613 prevails in the communities on the line;

(2) that no material change in the circumstances attending the operation of train No. 613 has occurred since our prior Decision in the matter of November 9th, 1950;

(3) that five (5) westbound evening trains would not provide adequate and proper service; and

(4) that public convenience and necessity require continuance of the operation of train No. 613."

The decision of the board was affirmed by the Appellate Division.

In its appeal the railroad first contends that since its operations are being conducted at a loss the requirement that it continue to operate train 613 is unreasonable and confiscatory and thus a deprivation of its property without due process of law in violation of its rights under the United States Constitution. It is well settled that a state through an administrative agency may regulate the services and facilities of a public utility in the public interest, but such power is at all times limited by the provisions of the Constitution so that services and facilities not reasonably needed in the public interest cannot be required. It is equally clear that the mere fact that the operation of a particular train results in a pecuniary loss to the railroad does not of itself establish a right to its discontinuance. In *Pennsylvania-Reading Seashore Lines v. Board of Public Utility Commissioners,* 5 *N. J.* 114 (1950), we held that a railroad cannot constitutionally be forced to furnish service which is not required by public convenience and necessity, but at the same time we stated that "The mere fact that a given railroad or branch or train is operating at a loss will not of itself justify suspension of any service." In *Pennsylvania Railroad Company v. Board of Public Utility Commissioners,* 11 *N. J.* 43 (1952), the Board of Public Utility Commissioners denied an application to discontinue four local commuter trains, finding among other things that the failure to earn an adequate return from the passenger service on the line was not of itself sufficient reason for the discontinuance of these four trains. On appeal we affirmed. In *Chesapeake & Ohio Ry. Co. v. Public Service Commission of West Virginia,* 242 *U. S.* 603, 37 *S. Ct.* 234, 236, 61 *L. Ed.* 520 (1917), the railroad instituted proceedings to set aside an order requiring it to maintain daily passenger service on a branch line, claiming a violation of due process and equal protection under the 14th Amendment of the United States Constitution because of the pecuniary loss attendant upon such passenger service. In its opinion the United States Supreme Court stated:

"One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state, and endures so long as they are retained. It represents a part of what the company undertakes to do in return for. them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss."

In *Alabama Public Service Commission v. Southern Railway Company*, 341 *U. S.* 341, 347, 71 *S. Ct.* 762, 767, 95 *L. Ed.* 1002, 1007 (1951), Chief Justice Vinson stated:

"The problems raised by the discontinuance of trains Nos. 7 and 8 cannot be resolved alone by reference to appellee's loss in their operation but depend more upon the predominantly local factor of public need for the service rendered. *Chesapeake & Ohio R. Co. v. Public Service Com. of West Virginia*, 242 *U. S.* 603, 608, 37 *S. Ct.* 234, 61 *L. Ed.* 520, 523 (1917)."

See *Atlantic Coast Line Railroad Company v. North Carolina Corporation Commission*, 206 *U. S.* 1, 26, 27 *S. Ct.* 585, 51 *L. Ed.* 933, 959 (1907) ; *Mississippi Railroad Commission v. Mobile & Ohio Railroad Company*, 244 *U. S.* 388, 391, 37 *S. Ct.* 602, 61 *L. Ed.* 1216, 1219 (1917) ; *Pennsylvania Railroad Company v. Board of Public Utility Commissioners*, 11 *N. J.* 43, 51, *supra.*

The railroad argues, however, that the result is different where the entire operation of the company is also conducted at a loss. In that situation it claims that the State cannot constitutionally require the railroad to continue its entire operation or perhaps even a branch thereof; therefore it claims that constitutionally it cannot be required to operate a single train at a loss. This contention overlooks the distinction between regulatory powers of a state over a railroad operating in the state and a railroad's right to go out of business. *Railroad Commission of Texas v. Eastern Texas Railroad Company*, 264 *U. S.* 79, 85, 44 *S. Ct.* 247, 248, 68 *L. Ed.* 569, 572 (1924), involved the right of a railroad to dismantle and abandon its road. The United States Supreme Court upheld the railroad's right to withdraw from intrastate commerce and to abandon the road saying:

"The company, although devoting its property to the use of the public, does not do so irrevocably or absolutely, but on condition that the public shall supply sufficient traffic on a reasonable rate basis to yield a fair return. And if at any time it develops with reasonable certainty that future operation must be at a loss, the company may discontinue operation and get what it can out of the property by dismantling the road. To compel it to go on at a loss or to give up the salvage value would be to take its property without the just compensation which is a part of due process of law."

But in discussing a situation where the railroad continued to operate under its charter the court also stated:

"So long as the railroad company 'continues to exercise' the privileges conferred by its charter, the state has power to regulate its operations in the interest of the public, and to that end may require it to provide reasonably safe and adequate facilities for serving the public, even though compliance be attended by some pecuniary disadvantage."

See *Brooks-Scanlon Co. v. Railroad Commission of Louisiana,* 251 *U. S.* 396, 40 *S. Ct.* 183, 64 *L. Ed.* 323 (1920).

A determination of this question, however, is unnecessary since the railroad has failed to prove a loss in its entire business or in its operation of train 613. In the record before us the railroad made no attempt to justify expenditures. For instance, in connection with the Erie Railroad we find no proof of the reasonableness of the sums paid to Erie as rent for rolling stock and other equipment or for use of its tracks. Moreover, although there was considerable evidence of intermingling of employees between the New Jersey and New York Railroad and the Erie Railroad there was no evidence of the reasonableness of the allocation of salaries paid to the same employees by the two companies. There was also testimony that train 632, which is the return train for 613, carried freight on its so-called "ghost ride" back to Jersey City. But although the operating cost of this run was charged to train 613, it does not appear that any of its freight revenue was credited thereto.

In a situation such as this where the public utility is an 80%-owned subsidiary of the parent company it is

incumbent upon the subsidiary to prove the reasonableness of its expenditures and the accuracy of its accounts. This is especially true where there is extensive intermingling of employees and where the subsidiary is to a large extent dependent upon the parent for rental of its equipment. Inasmuch as the railroad's operating loss, both as to its entire system and as to the particular train in question, is a factor to be considered by the board, the railroad has the duty to present proof of the propriety of its expenditures and to establish that its operating deficiency is *bona fide.*

Secondly, the railroad contends that the proofs submitted were such that the board should have found that the public convenience and necessity did not require the continued operation of train 613. In other words, it argues that the board's decision was unreasonable since the operating loss to the railroad outweighed any public inconvenience that might arise from the discontinuance of the train. This contention cannot be sustained. First of all, one of the important elements to be considered where public convenience and necessity is the test is the financial success of the railroad as a whole as well as of the particular train sought to be discontinued. Yet, as stated above, the railroad has completely failed to establish the existence of its alleged operating deficits for both the entire railroad and train 613.

Furthermore, in arriving at its decision the board must be governed by the test of public convenience and necessity. In this regard the local factor of public need of the services rendered is the predominating and controlling element, *Pennsylvania Railroad Company v. Board of Public Utility Commissioners,* 11 *N. J.* 43, 51 (1952), *supra; Alabama Public Service Commission v. Southern Railway Company,* 341 *U. S.* 341, 347, 71 *S. Ct.* 762, 95 *L. Ed.* 1002, 1007 (1951), *supra.* The proofs reveal that the area served by train 613 is increasing in population, that some 133 to 145 revenue passengers are carried daily, that the average number of passengers carried in the first half of 1951 was an increase of 13% over 1950. The elimination of train 613 will entail a 19- to 28-minute delay for passengers in arriving at their

destination after their day's work. The railroad claims that this delay is not substantial, but it failed to produce any evidence in support of this contention.

Finally, it contends that there is adequate bus service to compensate for the discontinuance of the train. We fail to find adequate proof of this in the record before us. The only evidence of the bus situation was presented by Mr. Krom, general passenger agent for the railroad, who testified that he made observations at a bus terminal in New York City and in Jersey City, in which general areas it is assumed that the large majority of passengers on train 613 are employed. He stated that between the hours of 4:15 P. M. and 5:15 P. M. "none of these buses were crowded, and each had quite a few empty seats," that they were "not loaded to capacity," that there were "quite a few vacant seats," and that he observed "some bus operations with 45 seat capacity where they were handling between 22 and 27 or 28 passengers." Such testimony falls short of showing that these buses were capable of accommodating the 133 to 145 revenue passengers served by train 613. Moreover, the statement of bus departures from New York City and Jersey City to the area serviced by train 613 prepared by Mr. Krom shows that buses from Jersey City, the terminal of train 613, cover trips to only four of the 17 municipalities, excluding Jersey City, served by the train.

In this posture of the proofs it cannot be said that the inconvenience to the railroad in continuing the operation of train 613 so clearly outweighs the public need that the decision of the Board of Public Utility Commissioners is erroneous. The judgment of the Appellate Division of the Superior Court is therefore affirmed.

WILLIAM J. BRENNAN, JR., J. (dissenting). I fully agree that in this type of case "the Board must be governed by the test of public convenience and necessity," but in the circumstances here I think both the Board of Public Utility Commissioners and the majority unduly emphasize the inconvenience of the passengers of train 613 at the expense

of the larger public interest in the continuance of the overall operation of this railroad. The majority sustains the finding of the board that there was public need requiring the continuance of the operation of train 613 in that otherwise the passengers using it must suffer the inconvenience of a 19- to 28-minute delay in arriving at their destinations after their day's work. However, the record suggests that both the entire railroad and the train have long been and are and probably will continue to be operated at substantial annual deficits. In such case there looms the prospect of an even more undesirable disservice to the public interest, namely, the discontinuance of the operation of the railroad and of all of its trains. The railroad cannot of course be asked to go on indefinitely as a losing venture. It does not seem to me that the board gave adequate, if indeed any, consideration to that fact and to the possibility of the eventuality that the railroad may go out of business, and whether this greater threat to the public need does not require relief to the road to avert that prospect, either by granting the application notwithstanding the resultant inconvenience to the passengers of train 613 or by the allowance of some alternate form of relief in the way of curtailment of other service or rearrangement of the entire service to effect a saving of expense. The relative importance of the larger public interest is shown by the fact that the discontinuance of this one train, according to the railroad's figures, would effect a reduction of some 20% in the railroad's overall net operating loss.

I agree with the majority, however, that the railroad did not sustain its burden to present proof of the propriety of its expenditures and to establish that its operating deficit is *bona fide*, and agree also that in this regard the relationship of the applicant with Erie necessarily implicates both the *bona fides* and the reasonableness of the expenses charged or allocated by Erie to the applicant. I would reverse and remand to the board for a further hearing with direction that if the *bona fides* and reasonableness of the claimed continuing deficits are established, there be granted such relief as

reasonably may be allowed consistent with a proper balancing of the several elements of public interest involved.

This dissent is joined in by Justice JACOBS.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD and BURLING—4.

*For reversal*—Justices HEHER, JACOBS and BRENNAN—3.