CHICAGO, MILWAUKEE, ST. PAUL & PACIFIC RAILROAD COMPANY *v.* PUBLIC SERVICE COMMISSION.

1. RAILROADS—DISCONTINUANCE OF SERVICE.
    Each case involving discontinuance of service by a railroad must be decided on its own facts.

2. APPEAL AND ERROR—PUBLIC SERVICE COMMISSION—RAILROADS—DE NOVO REVIEW.
    The Supreme Court hears appeals from orders of the circuit court in review of orders of the public service commission regulating railroads as a chancery case, hence, determines the facts *de novo* and makes own determination of the equities.

3. RAILROADS—DISCONTINUANCE OF SERVICE—PUBLIC CONVENIENCE—OPERATING LOSS—BRANCH LINE.
    Plaintiff railroad *held*, entitled to discontinue passenger service

---

REFERENCES FOR POINTS IN HEADNOTES

[2] 43 Am Jur, Public Utilities and Services § 229.
[3, 4] 44 Am Jur, Railroads §§ 366–370.
[3, 4] Right of railroad company to discontinue or reduce service on branch line or part of road which is unprofitable. 123 ALR 922.
[5] 14 Am Jur, Costs § 91.

on a 93-mile branch line, where public has virtually, but not completely, abandoned use of the line, even though a few people will be somewhat inconvenienced, and it appears that the branch has operated at a loss of from $53,304 in 1948 to $68,897 in 1951 and the railroad lost large sums in the State on intrastate business.

4. SAME—APPLICATION FOR REINSTATEMENT—CHANGE OF CONDITIONS.
Decree permitting discontinuance of passenger service on a 93-mile branch line is ordered entered on condition that there may be made an application to reinstate such service or any other substitute service not entailing loss should conditions change.

5. COSTS—PUBLIC QUESTION—PUBLIC SERVICE COMMISSION—INTRASTATE TRAINS.
No costs are allowed on review of circuit court decree affirming order of the public service commission denying permission to discontinue passenger train service on an intrastate branch line, a public question being involved.

Appeal from Ingham; Hayden (Charles H.), J. Submitted June 9, 1953. (Docket No. 19, Calendar No. 45,789.) Decided November 27, 1953.

Bill by Chicago, Milwaukee, St. Paul & Pacific Railroad Company against Michigan Public Service Commission to review order of defendant refusing permission to discontinue the running of two trains. Order of the commission affirmed. Plaintiff appeals. Reversed and remanded to Michigan Public Service Commission.

*Carson L. Taylor, Thomas H. Maguire, J. E. Goggin* and *Ballard, Jennings, Fraser & Parsons,* for plaintiff.

*Frank G. Millard,* Attorney General, *Edmund E. Shepherd,* Solicitor General, and *Daniel J. O'Hara, Charles M. A. Martin* and *Robert A. Derengoski,* Assistants Attorney General, for defendant.

Butzel, J.   The Chicago, Milwaukee, St. Paul & Pacific Railroad Company, a Wisconsin corporation, plaintiff herein, operates a large railroad system running through a number of States, including Michigan, where it is authorized to do business.   It maintains a branch line 93 miles in length between Channing and Ontonagon, Michigan, which runs through several small settlements.   Ontonagon, the northern terminal of the branch, has no other railroad facilities.   Channing, the other terminal, is a connecting point with one of plaintiff's main roads whereby transportation may be had to other points and other railroads, and thus to all parts of the country. Plaintiff runs one passenger train, the Copper Country Limited, daily in each direction between Chicago, Illinois, and Champion, Michigan.   Its route includes Channing, Michigan.   At Champion, it is taken over by the Duluth, South Shore & Atlantic Railroad, which runs this same train between Calumet and Champion, Michigan.   Since 1937, plaintiff has also run the Chippewa-Hiawatha, also known as trains No 14 and No 21, daily in each direction between Chicago and Ontonagon, Michigan, using the branch line between Channing and Ontonagon.   Plaintiff petitioned the Michigan public service commission, defendant and appellee, for permission to discontinue the Chippewa-Hiawatha between Channing and Ontonagon.   After hearings, the commission denied the petition, whereupon plaintiff appealed to the circuit court of Ingham county, Michigan, in accordance with statute, CL 1948, § 462.26 (Stat Ann § 22.45). The circuit court after further hearings entered a decree affirming the order of the commission and plaintiff has appealed to this Court.

The record shows that plaintiff has made efforts to build up its passenger business to Ontonagon, but possibly due to general conditions affecting the passenger business of so many railroads, as well as the

partial depletion of mines and forests in the particular areas and a decline in the population, the passenger business over the branch line has constantly decreased until it is now operated at a very large loss because of poor patronage. What particularly brought the question of discontinuance to a focus is the fact that between Channing and Ontonagon, the train frequently consists of a gasoline motor car, which also handles the mail, express and baggage business, and 1 passenger coach attached as a trailer, whereas between Milwaukee, Wisconsin, and Channing, it consists of a cafe lounge car, 2 to 5 passenger coaches (depending on seasonal demands), a mail car and express and baggage car, which are normally pulled by a diesel engine. Plaintiff has only 1 gasoline motor car available for this train and finds it necessary to periodically suspend its operation so that it can be inspected, serviced and repaired, whereupon steam power is used. The latter is much more costly, particularly because of the additional highly skilled employees required. The purchase of an additional gasoline motor car for use when the present one is out of service would involve an estimated expenditure at today's prices of approximately $170,000, almost a prohibitive amount when considered in the light of the very large losses plaintiff is being put to in the operation over the branch line at the present time. Even the addition of another gasoline motor car would not completely eliminate the use of steam power, because the latter may still become necessary in times of very bad weather or mechanical difficulties. Except for a few of the war years, there has been a steady decline in the number of passengers carried over the branch, so that in 1951, the average number of intrastate passengers carried in one direction was 1.9 per trip and 2.6 in the other direction, or a total of only 3.5 passengers per day for both trips. These figures

only included intrastate passengers, but in 1951 the average number of all passengers carried, both intra- and interstate was still only 8.8 a trip. Plaintiff lost $53,304 on the branch-line operation of trains No 14 and No 21 in 1948, and this amount has increased so that in 1951, it became $68,897. In determining this loss cognizance was taken of all passenger revenues, both inter- and intrastate, as well as express, mail and milk revenues, and of only out of pocket or relievable expenses, *i.e.*, those expenses which would be eliminated by the discontinuance of the branch-line service. Many expenses such as road-bed maintenance, depreciation of equipment and wages of station attendants were not included. The commission suggested that possibly fares could be increased and further economies be considered for the reduction of the losses. It is quite obvious that plaintiff would, in its own interest, bring about all economies possible. If the fares could be and were raised, in all probability such action would further discourage the modicum of patronage still left. In view of the sparse usage of the service involved we believe there has been a virtual, although not complete, abandonment of the use of the service involved by the public, rather than that plaintiff is seeking to abandon its use.

Discontinuance of the branch line was denied principally because there was no other public carrier serving Ontonagon and the communities between it and Channing. In *Chicago & North Western R. Co. v. Public Service Commission,* 329 Mich 432, there were other existing public services which provided travel with little inconvenience, and we, therefore, held that where substantial losses result from an operation, the test to be applied is whether such economic waste outweighs any public benefit or convenience.

There is some dispute in the present case as to the condition of the highways serving the communities involved. One witness, a county engineer, testified that almost every mile of road is kept open during the winter months. However, practically all of the highways are gravel surfaced and there is no doubt that during a severe winter the highways in places may heave up and break and in the springtime a motor car or truck might have some difficulties. It is too speculative to say what might happen. The public authorities should properly keep the roads in good condition. It is not unlikely that there might be motor service between the termini were there any demand for it. It is further shown that there is a very limited taxicab service available at Ontonagon, and also that since the time of the hearing before the commission a new tri-weekly permit has been issued to a new bus line running from Houghton to Ontonagon and Mass, Michigan, which is a short distance from Ontonagon on the branch line. Houghton is on one of the main lines of the Duluth, South Shore & Atlantic Railroad Company and is on the route of the Copper Country Limited. Sidnaw, located approximately midway between the termini of the branch, is also on one of the Duluth, South Shore & Atlantic's main lines, and passenger service is available from there to Champion, Michigan, which also connects with the Copper Country Limited. The testimony shows that the use of private motor cars has increased to such an extent today that the passenger business of railroads generally, including plaintiff, has materially suffered. Representatives of both the postal authorities and the express company testified that each of them would find some way of maintaining postal and express service to the communities along the branch if the branch line operations were discontinued.

Many of the witnesses sworn at the hearing to protest the discontinuance demonstrated that they made very little use of the service in question. In one instance a restaurateur said he had used it once a week to buy chicken and fish for his restaurant. Another, claiming necessity for continued operation, stated that he had used it only once in 4 years. Another testified that he made only sporadic use of it. Others used it more frequently, but not often. It seems an economic waste to force the continued operation over this branch under the circumstances. True, the discontinuance may inconvenience a few people, but that is no reason why plaintiff should continue to suffer such tremendous losses through the continuous decline in patronage as indicated. Even the opening of the Porcupine Mountains State Park, near Ontonagon, has not resulted in any material increase in passenger business, as the great majority of its visitors use private motor vehicles or some other means to reach it. The park manager testified that 116,000 people visited the park in 1950; that a travel count is taken of the cars; that in 1950, 11,000 people visited the ski areas; that he did not know how many people used the Chippewa-Hiawatha to reach the park, but that he did know that a few skiers had used it, probably 15 or 20 a year. There was considerable testimony regarding a new project which may or will be or has been subsidized by the government for a multimillion dollar copper mine development, the White Pine Mine, not far from the branch line, but the commission recognized that this was still in the planning stage and gave it no weight except to assume that if such a development were to be realized, increased traffic could be expected to accrue to plaintiff.

It would serve no useful purpose to further review the many cases cited in the briefs. Many cases hold that railroads operating an unprofitable branch of

an otherwise profitable line in the State must treat their intrastate passenger business as a whole, and cannot cast off the unprofitable part to the great inconvenience of the public when such loss is offset by their profitable lines. *Alabama Public Service Commission* v. *Southern R. Co.*, 341 US 341 (71 S Ct 762, 95 L ed 1002). However, such is not the case in Michigan, as far as plaintiff is concerned. Testimony shows that on its entire intrastate passenger business in Michigan plaintiff has been losing large sums each year for many years; in 1950, the amount was $312,029.

The Attorney General representing Michigan Public Service Commission stresses the very recent opinion in *Chicago, Milwaukee, St. Paul & P. R. Co.* v. *Board of Railroad Commissioners*, 126 Mont 568 (255 P2d 346), certiorari denied by the supreme court of the United States on October 12, 1953, see 346 US 823 (74 S Ct 40, 98 L ed —). In this case the supreme court of Montana reversed the decree of the district court permitting the discontinuance of 2 passenger trains running through Great Falls, Lewiston and Harlowtown, cities with comparatively large populations. By the recent census Great Falls has a population of 39,214, Lewiston, 6,573, and Harlowtown, 1,733. The 2 trains sought to be discontinued were run at a loss of $83,690 for the year. The opinion pointed out the additional factor that the express and mail service to these 3 cities would be adversely affected through such discontinuance. The court expressly stated that the facts in each case should be separately considered and from them the question is to be determined. In the instant case the late census gives the population of Ontonagon at 2,307, and of the other 9 stations on the branch line excluding Channing at 2,847. Channing has a population of 600.

Our attention is also directed to the very recent opinion in *Re New Jersey & New York R. Co.*, 12 NJ 281 (96 A2d 526), appeal dismissed by the supreme court of the United States, November 9, 1953, 346 US 868 (74 S Ct 123, 98 L ed —), where the majority of the court refused discontinuance. It was shown that the number of paying passengers on each trip of the train sought to be discontinued varied from 133 to 145 and there had been a monthly increase of 13% in the number of passengers carried, and that a part of the loss was due to the expenses of paying for rolling stock and other equipment and unusual expenses. We do not regard these cases as any authority when applied to the facts in the instant case. We shall not cite the large number of cases where discontinuance has been ordered. Each case must be decided on its own facts. We believe that the plaintiff is entitled to the relief prayed for.

The decree of the trial court is reversed and the case is remanded to the Michigan Public Service Commission to enter an order permitting the discontinuance of these 2 trains on condition, however, that an application to reinstate such passenger service or any other substitute service not entailing loss may be considered and appropriate order made should conditions change. Decree may be entered in accordance with this opinion. No costs are allowed, a public question being involved.

DETHMERS, C. J., and ADAMS, CARR, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.