182 N.J. Super. 42 (1981)
440 A.2d 32
DECAMP BUS LINES, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
DEPARTMENT OF TRANSPORTATION OF THE STATE OF NEW JERSEY, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1981.
Decided December 15, 1981.
*44 Before Judges BISCHOFF, KING and POLOW.
Arthur S. Goldstein argued the cause for appellant (Kimmelman, Wolff & Samson attorneys; Arthur S. Goldstein on the brief and Bendit, Weinstock & Sharbaugh attorneys; James F. Keegan on the brief).
Robert H. Stoloff, Deputy Attorney General, argued the cause for respondent (John J. Degnan, former Attorney General of New Jersey and Stephen Skillman, Assistant Attorney General, of counsel).
Jonathan Goodman argued the cause for amicus curiae DeCamp Bus Riders Association.
The opinion of the court was delivered by POLOW, J.A.D.
On July 24, 1978 DeCamp Bus Lines (DeCamp) petitioned the Board of Public Utilities (BPU) to permit discontinuance of all of its regular intrastate bus routes in New Jersey. After extensive hearings permission was denied and no appeal was taken therefrom.
On May 16, 1980 DeCamp notified the Commissioner of Transportation that it would discontinue all its regular and charter intrastate service in New Jersey. Notices to that effect were posted on its buses indicating that service would be discontinued on June 30, 1980. Since no formal application had been made to *45 the Department of Transportation (DOT), DeCamp was ordered to continue service pending compliance with N.J.S.A. 48:2-24 which prohibits discontinuance of service by a public utility without permission of the Board of Public Utilities Commissioners.
DeCamp then sought a declaratory judgment in the Chancery Division recognizing its right to discontinue service without compliance with N.J.S.A. 48:2-24. The Chancery Division judge, concluding that DeCamp was in effect attempting to appeal from an administrative determination, transferred the entire matter to the Appellate Division.[1]
DeCamp has for many years provided intrastate and interstate bus service, including regularly scheduled routes and charter service. It operates a number of interstate routes, not involved in this suit, which make up the bulk of its business. Of 107 busses, 86 are used for interstate transport, 8 for charter service and 13 are used for intrastate routes. DeCamp holds four intrastate Certificates of Public Convenience and Necessity. One licenses charter service while the other three license the following regular intrastate bus routes:
Route # 22  Jersey City to Caldwell Route;
Routes # 145-46  Morristown to Newark Route;
Route # 32  Nutley to Union Route (currently operated by Arrow Bus Lines pending application to transfer the route from DeCamp to Arrow).
Evidently the intrastate routes have been unprofitable for a long time, although there has been financial improvement during the last few years. On DeCamp's 1978 petition to the BPU[2] to discontinue or transfer all its regular bus routes (excluding charter and interstate operations), the agency concluded that despite DeCamp's losses on intrastate routes, its overall business was sound. Since there was no viable alternative means of *46 transportation for riders who used those routes, plaintiff's application was denied as not "in the public interest."
Upon the death of Stuart DeCamp his estate, which controls 50% of DeCamp's stock, sought liquidation of the company, whereupon DeCamp, without approval by the DOT, placed notices on its busses that all service would terminate as of June 30, 1980. Upon receiving letter notice of DeCamp's intentions, the DOT ordered continuation of the intrastate operations, citing the requirements of N.J.S.A. 48:2-24.
DeCamp contends that the Due Process Clauses of the Constitutions of the United States and New Jersey prohibit the attempt to force "DeCamp to provide transportation services indefinitely." It urges recognition of an unqualified right to go out of business, a liberty and property right of which it cannot be deprived by statute.
There is authority to support the power of the State to require a utility to continue to provide services, even unprofitably, upon a finding of public necessity. In Pennsylvania R. Co. v. Public Utilities Comm'rs Bd., 11 N.J. 43 (1952), the railroad sought to discontinue certain unprofitable rail lines. The BPU refused permission. In upholding the Board's determination, the Supreme Court noted that:
One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public, and this duty arises out of the acceptance and enjoyment of the powers granted by the State and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them and its performance cannot be avoided merely because it will be attended by some pecuniary loss. The local factor of public need of the services rendered is the predominating and controlling element. [at 50-51]
Similarly, in In re New Jersey & New York R. Co., 12 N.J. 281 (1953), app. dism. 346 U.S. 868, 74 S.Ct. 123, 98 L.Ed. 378 (1953), the court, quoting Chesapeake & Ohio Ry. Co. v. Public Service Comm. of West Virginia, 242 U.S. 603, 37 S.Ct. 234, 61 L.Ed. 520 (1917), concluded:
One of the duties of a railroad company doing business as a common carrier is that of providing reasonably adequate facilities for serving the public. This *47 duty arises out of the acceptance and enjoyment of the powers and privileges granted by the state, and endures so long as they are retained. It represents a part of what the company undertakes to do in return for them, and its performance cannot be avoided merely because it will be attended by some pecuniary loss. [at 287]
DeCamp, however, insists that by terminating its entire intrastate operation, enforced continued operation constitutes a taking, violating its constitutional due process rights. The State, while conceding that the DOT cannot unreasonably withhold permission to discontinue service "once it is requested," insists that DeCamp must first comply with the following requirements of N.J.S.A. 48:2-24:
No public utility shall discontinue, curtail or abandon any service without obtaining permission from the board after notice. The board may withhold permission until after hearing to determine if the discontinuance, curtailment or abandonment will adversely affect public convenience and necessity. .. .
If any public utility shall discontinue, curtail or abandon service and the board after hearing upon notice shall find and determine that service should be resumed, the board may order that service be resumed forthwith or on such date as it may fix.
Indeed, the problem of unprofitability has been addressed by our Supreme Court. In Central R. Co. v. Public Utilities Comm'n Bd., 10 N.J. 255 (1952), app. dism. 345 U.S. 931, 73 S.Ct. 794, 97 L.Ed. 1361 (1953), the court stated that:
Analysis of all the decisions of the United States Supreme Court hereinabove adverted to indicates that where the state action under review involves a specific operation, such as the running of a certain transportation unit or the carriage of passengers over a particular portion of the railroad's lines, the consideration of public need for the service may be paramount to the operating loss and save the order from invalidation on constitutional grounds, but where entire services are concerned, such as intrastate passenger service, although different categories of service may be required to be supplied at lower rates of return than others, no category of service may constitutionally be required to be maintained at a loss. The rationale of the latter theory is that excessive charges may not be placed on one class of service in order to provide a return on the carrier's entire service, where another class of service is maintained at a loss. [at 265]
Thus, we conclude that the DOT may order continuation of service for a reasonable time, during which alternative service possibilities and certificate transfers may be explored. Although we find no direct authority in this State, the federal courts have addressed the problem. In Matter of Valuation *48 Proceedings Under §§ 303(c) and 306, 439 F. Supp. 1351 (Spec. Ct., Regional Rail Reorganization Act, 1977), Judge Friendly noted that
... [t]he mere fact that a railroad, even one in reorganization, is in a hopelessly losing position does not entitle it to quit operations immediately in the face of statutes requiring approval of such cessation by federal or state regulatory agencies; they concede there is no "taking" until government has had a reasonable opportunity to make alternative arrangements for the carrying on of such public service as is found to be needed. [at 1369]
........
... [it is not] a taking of the portion of the estate eroded during a reasonable period required to obtain the needed abandonment authority in a proceeding which enables the Government to explore and develop alternative solutions. Although there is "no set formula to determine where regulation ends and taking begins," Goldblatt v. Town of Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962) [citations omitted]
We have no doubt that requiring even a hopelessly losing railroad to obtain administrative permission for abandonment falls on the regulatory side. The building and operation of a railroad are not merely an added service to persons already on the scene so that its withdrawal would leave them no worse off than they were before. The railroad attracts more people and more investment on the justified expectation that service will continue. [at 1371]
DOT must direct its attention to disposition of the application to terminate all intrastate service, to the end that a final disposition is reached within a reasonable time after filing of an appropriate application as required by statute. As stated in addressing a similar problem involving the Central Railroad of New Jersey:
Underlying the taking argument is the basic principle that an owner of property retains the right ultimately to withdraw that property from a losing venture. Indeed, such a right appears to be a fundament of the taking provision. Operation of the passenger services, if not more adequately compensated, would, at some point, so substantially reduce the assets remaining in the railroad that the continuation would constitute a taking.
The Trustees might contend that a requirement that they seek relief now from the appropriate agency would result in further delay in termination and that any delay would exacerbate an already critical financial situation. They might further argue that the resort to New Jersey agencies would most likely provide only frustration, and therefore would be an empty formality.
However, the fact remains that the Trustees have not sought relief from the appropriate agency. There having been no application made, there can be no showing that delay or frustration would be the inevitable result. [In Re Central *49 R. Co. of N.J., 485 F.2d 208, 213 (3 Cir.1973), cert. den. 414 U.S. 1131 [94 S.Ct. 870, 38 L.Ed.2d 755] (1974); footnotes omitted].
........
This Court's holding does not preclude ... courts from permitting ailing railroads to terminate services. Rather, it holds only that the reorganization court required railroads seeking termination to follow certain procedures. Adherence to such procedures is not an exercise in formalism. Rather, such adherence reflects two important concerns. First, application to the appropriate state agency preserves the balance between federal and state powers in this field. Second, administrative review assures that an agency with substantial expertise, be that agency state or federal, will provide that the appropriate amalgam of public concerns for rail transport and private rights of property is achieved. [485 F.2d at 215]
DeCamp argues that it has the absolute right to terminate its entire operation and that it is subject to N.J.S.A. 48:2-24 only so long as it carries on any intrastate business. It asserts that once it opts to discontinue all such service, the statute and DOT's power to regulate it immediately cease to exist.
We disagree. If DeCamp's interpretation of the statute's impact were correct, the public would face the possibility of total loss of an essential utility service without notice and without the opportunity to avoid possibly catastrophic consequences of such loss. Hence, we conclude that the legislature clearly intended its statutory language, "No public utility shall discontinue, curtail or abandon any service without ... permission from the board ..." to apply to total or partial termination. N.J.S.A. 48:2-24 (emphasis added).
Absent proper application, DeCamp does not have the right as a public utility to surrender, unilaterally, its certificates on bare notice alone. It may reasonably be required to continue all service for a reasonable time to allow for exploration of alternatives. For this purpose, the matter is remanded to the DOT for consideration of DeCamp's application to abandon all intrastate service, pursuant to N.J.S.A. 48:2-24. If formal application has not yet been submitted, it may be done forthwith and hearings shall be arranged and conducted, as necessary, within 90 days.
*50 Upon remand, the DOT shall consider, in reviewing DeCamp's financial problems, whether charter operations must be treated separately or as part and parcel of the entire intrastate operation and whether the interstate operations have any bearing whatever on the present application. These are factors to which agency expertise must be directed in the first instance before appellate consideration is appropriate. The intricate and complex issues involved present exactly the kind of perplexing dilemma for which application of technical administrative expertise is necessary even though statutory interpretation is also in issue. DOT, by reason of its expertise, "is better qualified ... to pass upon the ... questions raised ... and to do so before the matter is further considered by the courts." Schults v. Teaneck Bd. of Ed., 86 N.J. Super. 29, 46 (App.Div. 1964) aff'd 45 N.J. 2 (1965).
The order of the Department of Transportation is affirmed and the matter is remanded for further administrative proceedings consistent with this opinion.
NOTES
[1] A notice of appeal from the DOT order had already been filed and both matters have been consolidated on appeal.
[2] The functions of the BPU in this regard have now been transferred to the DOT pursuant to the Executive Reorganization Act, N.J.S.A. 52:14C-1 et seq.